[Civ. No. 67762. Second Dist., Div. Five. Feb. 16, 1984.]

ROBERTO ANAYA, Plaintiff and Appellant, v.
CHARLES TURK et al., Defendants and Respondents.

**COUNSEL**

Kim H. Pearman for Plaintiff and Appellant.

Yusim, Stein & Hanger, Jeffrey G. Keane and Michael Tancredi for Defendants and Respondents.

**OPINION**

**FEINERMAN, P. J.**—Plaintiff, Roberto Anaya, appeals from a summary judgment in favor of defendants Charles and Patricia Turk, as individuals, and doing business as Turk's Import and Export. In his first amended complaint, plaintiff sought damages for severe personal injuries suffered when, as a social guest in defendants' apartment, he was shot by another defendant, Stanley Wilson (Wilson).[1] As a result of his injuries, plaintiff is now a paraplegic.

---

[1] There is no indication in the record before us that Wilson has appeared in this matter. He was not a party to the summary judgment procedure and is not a party to this appeal. Accordingly, our reference to defendants shall indicate only Charles and Patricia Turk. The record indicates that the Turks were never married, but they lived together as husband and wife for a number of years. Patricia assumed the Turk name, and they held themselves out to the public as husband and wife.

Plaintiff's first amended complaint contained two causes of action pertaining to defendants. In the first cause of action, plaintiff alleged that defendants were lessees[2] of the premises at 10225 Regent Street, Apartment 4, in the City of Los Angeles. Plaintiff alleged that defendants were negligent in maintaining, supervising and controlling said premises in that they allowed Wilson on the premises when they knew that he possessed vicious and dangerous propensities—in that he was inclined to attack, rob, injure and murder persons in his vicinity. Plaintiff claimed that defendants also negligently failed to warn him of Wilson's known dangerous propensities. Plaintiff further alleged that on August 27, 1979, while plaintiff was a guest at defendants' apartment, as a direct result of defendants' failure to bar Wilson or to warn plaintiff of Wilson's known dangerous propensities, Wilson fired a handgun at plaintiff and severely injured him.

Plaintiff's second cause of action is based on the same facts, but in this cause of action plaintiff alleged that defendants had been engaged in the sale and purchase of "restricted dangerous substances such as heroin and cocaine" with members of the general public between May 9, 1977, and August 27, 1978. He alleged that defendants knew or should have known that customers and prospective customers of defendants' illegal drug transactions were likely to be narcotic addicts and to possess vicious and dangerous propensities in that they were likely to be armed and would attack, rob, and injure persons in the vicinity of the drug transactions. It is alleged that defendants knew or should have known that sales and purchases of narcotics involve a high risk of death and great bodily injury to unknowing and innocent persons present during a drug transaction. Plaintiff alleged that on August 27, 1978, he was present in defendants' apartment when defendants attempted to sell narcotics to Wilson, that plaintiff knew nothing of any illegal drug activity on the premises, that defendants negligently failed to warn him about the dangerous activity being carried out at the apartment, and that as a result of defendants' negligence, plaintiff was severely injured when Wilson fired a handgun at him.

*Summary Judgment as to the First Cause of Action.*

Plaintiff's first cause of action tenders this question: Does a lessee of property have a duty to control criminal conduct of third persons on the rented premises or a duty to warn social guests who come on the premises about criminal propensities of other persons also on the premises?

■ "As a basic general principle, in the absence of a special relationship or circumstance, a private person has no duty to protect another from a

---

[2]The record indicates that the lease of the apartment was in the sole name of Patricia Turk.

criminal attack by a third person [citations]." (*Totten v. More Oakland Residential Housing, Inc.* (1976) 63 Cal.App.3d 538, 541 [134 Cal.Rptr. 29]; Annot., Duty and Liability—Attack by Another, 10 A.L.R.3d 619, 626; Rest.2d Torts, § 315.) However, a special relationship giving rise to such a duty has been found to exist between common carrier and passenger, innkeeper and guest, landowner and invitee, custodian and ward. (Rest.2d Torts, § 314A.)

The only relationship between plaintiff and defendants revealed in the affidavits of the parties submitted in support of and in opposition to the motion for summary judgment is that of a social guest on the premises of a friend or acquaintance. While plaintiff alleges that defendants maintained an import-export business on the premises of their apartment, it is clear from the evidence that plaintiff was not there as a business or public invitee, but merely as a licensee.

In the landmark case of *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], the California Supreme Court held that the liability of an owner or occupier of land for negligence in the management of his property should not be dependent solely on the status of the plaintiff as a trespasser, licensee or invitee. The court stated (69 Cal.2d at p. 119), "The proper test to be applied to the liability of the possessor of land in accordance with section 1714 of the Civil Code is whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others, and, although the plaintiff's status as a trespasser, licensee, or invitee may in the light of the facts giving rise to such status have some bearing on the question of liability, the status is not determinative."[3] In *Rowland,* the plaintiff was a social guest on the premises of defendant's lessee's apartment when his hand was injured on a defective faucet which defendant was aware of but failed to repair and failed to warn plaintiff about.

In the case before us, plaintiff does not seek to establish that defendants had a duty to make their property safe against the criminal acts of others, but rather that they had a duty to protect plaintiff from the criminal acts of others on the premises either by refusing admittance to known dangerous characters or by warning plaintiffs about the known dangerous propensities of other persons on the property.

The determination as to whether a particular duty exists is a question of law and is essentially a public policy decision. Guidelines for such a

---

[3]Civil Code section 1714 provides: "Everyone is responsible not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has willfully or by want of ordinary care brought the injury upon himself. . . ."

determination were set down by the court in *Rowland* v. *Christian, supra,* 69 Cal.2d 108, at page 113, where the court stated that the decision is made by balancing a number of considerations, including: "[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (See *Shelton* v. *City of Westminster* (1982) 138 Cal.App.3d 610, 617 [188 Cal.Rptr. 205].)

While all the factors mentioned in *Rowland* are important, it has often been said that the issue of duty rises or falls primarily on the question of foreseeability. ■ With respect to the degree of foreseeability necessary to charge a landowner with liability for the actions of third persons, the court in *7735 Hollywood Blvd. Venture* v. *Superior Court* (1981) 116 Cal.App.3d 901 [172 Cal.Rptr. 528] stated at page 905, "A proprietor of premises is not the insurer of the safety of persons on those premises. His duty to control the acts of third persons is a duty of reasonable care to protect against known or reasonably foreseeable risks. He is not required to take precautions against attacks by third persons which he has no reason to anticipate. [Citations.]"

In *Wingard* v. *Safeway Stores, Inc.* (1981) 123 Cal.App.3d 37 [176 Cal.Rptr. 320], the defendant owned a warehouse and plaintiff was an employee of the security guard service hired by defendant to guard the warehouse. Plaintiff was sexually assaulted by an intruder while patroling the warehouse premises and sued defendant for negligence in maintaining its warehouse. The appellate court affirmed a summary judgment in favor of defendant stating (123 Cal.App.3d at p. 43): "The cases are many which hold that, in the absence of prior similar incidents, an owner of land is not bound to anticipate the criminal activities of third persons, particularly where the wrongdoer was a complete stranger to both the landowner and the victim and where the criminal activity leading to the injury came about precipitously. [Citations.] Here, the record is clear that there were no previous assaults or even threats of violent criminal activity. The previous thefts at the warehouse neither provided notice nor created any reasonable foreseeability of the sexual attack which was inflicted upon plaintiff. [Citation.]" (See *Riley* v. *Marcus* (1981) 125 Cal.App.3d 103, 109, fn. 2 [177 Cal.Rptr. 827]; *Jamison* v. *Mark C. Bloome Co.* (1980) 112 Cal.App.3d 570, 576 [169 Cal.Rptr. 399].)

■ In the case at bench, plaintiff alleged in his first cause of action that defendants knew or should have known that Wilson possessed dangerous

propensities in that he was inclined to attack, rob, injure, etc. persons in his vicinity. The evidence presented in the summary judgment procedure fleshed out the incident. In his declaration, defendant Charles Turk stated that in the early hours of the morning on August 27, 1979, he called plaintiff and asked if plaintiff could give him a ride to the airport later in the day. Plaintiff said he wouldn't be available later, but he could give him an immediate ride. Plaintiff went to the Turk apartment and Charles Turk asked him to come in while he finished packing. Shortly thereafter, Stanley Wilson, a man whom Charles Turk had been in prison with, phoned. He wanted to borrow $200 from Charles, and Charles told him to hurry over, as he would be leaving shortly.

After about 20-30 minutes had passed, Wilson arrived. Charles Turk "indicated I would loan him the $200.00," and Wilson asked if he could use the bathroom. Wilson stepped into the bathroom, and Charles sat at the dining room table with plaintiff, where they had been engaged in a game of chess. A few minutes later Charles heard Wilson coming from the bathroom. As he turned, he saw that Wilson was holding a gun. Wilson fired a shot which struck Charles in the face. Charles ran out onto the balcony of the apartment and jumped, injuring both his legs. He states that he subsequently learned that Wilson shot plaintiff and that Wilson took several valuable items from Charles' apartment and from plaintiff's person.

On the issue of the foreseeability of Wilson's conduct, Charles Turk testified: "I never personally observed nor did I ever hear of any acts of violence perpetrated by Mr. WILSON either before the incarceration at McNeil Federal Penitentiary or while he was incarcerated at McNeil Federal Penitentiary. I did not know of any gangs or other personal organizations that Mr. WILSON belonged to. I presently believe that Mr. WILSON was released from McNeil Federal Penitentiary short of serving his full sentence for good behavior."

Plaintiff's materials in opposition to the motion for summary judgment do not provide any evidence of prior specific acts of violence on the part of Wilson or prior specific acts of violence which had occurred in or around defendant's apartment. It is clear, at least with respect to plaintiff's first cause of action, that plaintiff relies only on the fact that defendants knew Wilson was an ex-convict to support his contention that defendants had reason to know of Wilson's dangerous propensities. We hold that as a matter of law such generalized knowledge cannot be the basis of a finding of foreseeability. As was said in *Totten* v. *More Oakland Residential Housing, Inc., supra,* 63 Cal.App.3d 538, 543: "[I]n the instant case a duty cannot be imposed for the further reason that appellants failed to allege sufficient facts that respondent could reasonably foresee or anticipate the criminal

conduct in question and the probability of injury resulting therefrom. While there are general allegations in the complaint that the apartment building was located in a high-crime area where violent crimes repeatedly occurred; that respondent had either actual or constructive knowledge thereof; and that there were numerous complaints about violent crimes which had taken place on the premises prior to the incident in question, appellants conspicuously failed to aver either the specific nature of the prior crimes or respondent's knowledge thereof. It has been repeatedly held that in the absence of prior similar incidents, the landlord is not bound to anticipate the criminal activities of third persons, especially where, as here, the wrongdoers were complete strangers to both the landlord and the victim, and where the fight and the shooting incident leading to the injury came about precipitously [citations]. Viewed most favorably, appellants' complaint alleges no more than that the commission of violent crimes was foreseeable in the apartment house and/or its vicinity. This general allegation, however, does not support the imposition of a duty upon the landlord." (See *Rogers v. Jones* (1976) 56 Cal.App.3d 346, 351-352 [128 Cal.Rptr. 404]; *Goldberg v. Housing Auth. of Newark* (1962) 38 N.J. 578 [186 A.2d 291, 293, 10 A.L.R.3d 595].)

An apartment dweller cannot be held to have a duty to protect friends and acquaintances from the violent criminal conduct of others on the premises unless he has reasonable cause to anticipate such conduct. Mere knowledge that Wilson had been in federal prison did not constitute reasonable cause to anticipate his violent conduct.

We conclude that summary judgment was properly granted as to the first cause of action.

### Summary Judgment as to the Second Cause of Action.

Plaintiff's second cause of action presents a different situation. Plaintiff alleges that defendants had been conducting illicit drug transactions from their apartment over a period of time and that on August 27, 1978, plaintiff was present in their apartment as an innocent and unknowing social guest when an illicit drug transaction was attempted between defendants and Wilson. During the course of that transaction, plaintiff alleges he was shot by Wilson. Plaintiff further alleges that defendants were actively engaged in a dangerous activity—to wit, drug trafficking—and that defendants' engagement in that activity exposed plaintiff to the increased risk of harm which resulted in his injuries.

The difference between the first and second causes of action is that in the first, plaintiff posits defendants' alleged liability on mere nonfeasance (fail-

ure to intervene for the benefit of plaintiff); whereas, in the second cause of action, plaintiff bases defendants' liability on actual misfeasance (defendants' creation of the risk of harm which resulted in plaintiff's injury).

In *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40 [123 Cal.Rptr. 468, 539 P.2d 36], the California Supreme Court considered the liability of a radio station for a wrongful death which resulted when youthful participants in a station-sponsored contest negligently forced the victim's car off a road. The radio station, relying on section 315 of the Restatement Second of Torts,[4] contended that it owed no duty to the decedent. ■ The court concluded that section 315 was inapplicable where, as here, a complaint is grounded on an affirmative act of defendant which created an undue risk of harm. The court stated (15 Cal.3d at pp. 48-49):

"Defendant, relying upon the rule stated in section 315 of the Restatement Second of Torts, urges that it owed no duty of care to decedent. The section provides that, absent a special relationship, an actor is under no duty to control the conduct of third parties. As explained hereinafter, this rule has no application if the plaintiff's complaint, as here, is grounded upon an affirmative act of defendant which created an undue risk of harm.

"The rule stated in section 315 is merely a refinement of the general principle embodied in section 314 that one is not obligated to act as a 'good samaritan.' [Citations.] This doctrine is rooted in the common law distinction between action and inaction, or misfeasance and nonfeasance. Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention. As section 315 illustrates, liability for nonfeasance is largely limited to those circumstances in which some special relationship can be established. If, on the other hand, the act complained of is one of misfeasance, the question of duty is governed by the standards of ordinary care discussed above. [Fn. omitted.]"

Other cases recognize the distinction elucidated in *Weirum*. In *Pamela L.* v. *Farmer* (1980) 112 Cal.App.3d 206 [169 Cal.Rptr. 282], this court held that a cause of action could be stated against a wife, who invited minor girls to swim at her pool in her absence and told their parents it was safe because

---

[4]Section 315 provides: "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b) a special relation exists between the actor and the other which gives to the other a right to protection."

her husband would be there, where the wife knew that her husband had a record as a sexual offender. In that case we stated (112 Cal.App.3d at pp. 209-210):

"Respondent cites the principle that generally a person has no duty to control the conduct of a third person, nor to warn those endangered by such conduct, in the absence of a 'special relationship' either to the third person or to the victim. [Citations.] However, this rule is based on the concept that a person should not be liable for 'nonfeasance' in failing to act as a 'good Samaritan.' It has no application where the defendant, through his or her own action (misfeasance) has made the plaintiff's position worse and has created a foreseeable risk of harm from the third person. In such cases the question of duty is governed by the standards of ordinary care. [Citations.]

"This latter principle is embodied in Restatement Second of Torts section 302B which provides: 'An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.' [Citation.]

"Here respondent did not merely fail to prevent harm to plaintiffs from Richard. Respondent by her own acts increased the risk of such harm occurring."

█ Defendant Patricia Turk contends that liability could not attach to her because she was attending the California State Fair in Sacramento on August 27, 1983, and knew nothing about the incident. However, as the sole lessee of the premises, which was utilized for both business and residential purposes, Patricia's liability can be premised on the fact that a dangerous activity—to wit, drug trafficking—was taking place on the premises, if it can be established that she had knowledge of drug transactions and had the opportunity and ability to eliminate the drug sales on the property. In *Rosales* v. *Stewart* (1980) 113 Cal.App.3d 130 [169 Cal.Rptr. 660], plaintiffs' child was killed when defendant's tenant fired a shot from the backyard of defendant's property which was next door to plaintiff's property. Plaintiffs alleged that defendants knew that their tenants often conducted target practice in the backyard of their property. This court held that a demurrer to the complaint should not have been sustained without giving plaintiff a chance to amend to state facts showing that the landlord had the opportunity and ability to eliminate the dangerous condition on his property. In the instant case, Patricia, as the sole lessee of the premises, clearly had the opportunity and ability to eliminate the drug sales on her property, assuming knowledge of the transactions, which plaintiff alleged she had.

 We are thus brought to the determinative issue on the motion for summary judgment as to the second cause of action. Defendants contend that there is no evidence that defendants were engaged in illicit drug trafficking and that there is no evidence that a drug transaction was taking place at the time of the alleged shooting on August 27, 1979. Patricia Turk testified that she had no knowledge that Charles Turk had ever sold or purchased any type of narcotic during the time they resided at the Regent Street apartment. Charles Turk testified that he had never sold Wilson morphine or heroin and that he did not intend to sell him any on August 27, 1979.

In response, plaintiff introduced evidence that Charles Turk had been convicted of possession and sale of heroin in 1974, and that he served time in the federal penitentiary for that offense. He also presented evidence showing that Patricia and Charles Turk's business, Turk's Imports, which was conducted jointly by them at their residence, was engaged in selling macrame items, pipes, smoking accessories, gift items, ceramics and baby laxative, a product called mannite, which Charles Turk knew could be used to cut heroin. Turk's Imports advertised their baby laxative in magazines such as Head, Paraphernalia and Good Times, magazines directed toward persons interested in narcotics as a social pursuit. Finally, plaintiff offered · the declaration of a licensed private investigator named Theodore J. Heisig who states that he is "a narcotic expert having qualified as an expert witness in both Federal and State Courts on numerous occasions."[5] Mr. Heisig explains that he has talked to plaintiff, investigated the prior police records of Wilson and defendant Charles Turk, read the depositions of plaintiff and both defendants, and reviewed all of the police and investigative reports in the case which had been made available. Mr. Heisig states that his investigation is continuing but that it is his opinion based upon his expertise and experience as a narcotics investigator "[T]hat on August 27, 1978 a narcotic transaction involving either cocaine or heroin was to take place between CHARLES TURK and STANLEY WILSON at the apartment resided in by CHARLES TURK and PATRICIA TURK. It is my further opinion that this transaction took place without the knowledge of ROBERT ANAYA and that ROBERT ANAYA was used by the TURK's [sic] without ANAYA's knowledge of the narcotic transaction to give the appearance to STANLEY WILSON that the TURK's had protection and 'muscle' behind them in case STANLEY WILSON attempted to take the illegal drugs by force. This is a standard ploy used by people dealing in the sale of narcotics to use an innocent third party to establish a show of force."

---

[5]Attached to Mr. Heisig's declaration is Mr. Heisig's resume showing, among other things, that he spent 2 years in the New York City Police Department, and 22 years as an enforcement agent with the United States Treasury Department Bureau of Narcotics and Bureau of Narcotics and Dangerous Drugs—United States Department of Justice.

Heisig testified that it is a common occurrence in drug transactions that the person buying the drugs will attempt to take them by force without paying for them, and will shoot or kill anyone in his way. Heisig also expressed his opinion that defendants' business, Turk's Imports, was a "front or cover for the illegal sale and distribution of narcotics" based on: (1) Charles' criminal background, (2) the defendants' sale of baby laxative which is used as a cutting agent for narcotics, and (3) defendants' advertisements in Paraphernalia, Head Magazine and High Times, which magazines are purchased by users of dangerous drugs. Heisig further opined that "CHARLES and PATRICIA TURK were jointly involved in selling narcotics for a profit and that this type of activity results and did result in a high risk of death or bodily injury from shootings and attempted killings which take place at the time of the narcotic transaction and which are common dangers from the illicit traffic in drugs."

■ Defendants contend that Heisig's declaration was without foundation and improper opinion testimony, relying on *People v. Hernandez* (1977) 70 Cal.App.3d 271 [138 Cal.Rptr. 675].[6] We believe that case is inapposite here. *Hernandez* was a criminal case in which a narcotics expert was used to explain the significance of certain physical conduct that had already been described by other witnesses. This court stated (70 Cal.App.3d at p. 280): "The circumstances of this case furnish no basis for admitting Officer Zeuner's opinion. The jury was fully aware that the contacts which the officer described took place outside of a methadone center 'where narcotics addicts, heroin addicts go.' They had been informed that two of the four people who approached defendant were narcotic users and could form their own conclusions about the other two. The officer was no more expert than the jurors concerning the significance of the fact that the four persons kept looking at the area where defendant had his hands. Nor did the officer's expertise add any probative value to defendant's shaking of his head from side to side when he was approached by two other persons."

In this case, Heisig's testimony primarily focused on the modus operandi of drug dealers and purchasers, the use of baby laxative as a cutting agent for narcotics, and the significance of advertising baby laxative in certain magazines designed to appeal to the drug trade. These are subjects sufficiently beyond common experience so that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801; *People v. Jenkins* (1975) 13 Cal.3d 749, 755 [119 Cal.Rptr. 705, 532 P.2d 857]; *People v. Newman* (1971) 5 Cal.3d 48, 53 [95 Cal.Rptr. 12, 484 P.2d 1356] [disapproved on a point not pertinent here in *People v. Daniels* (1975) 14 Cal.3d 857, 862

---

[6]Code of Civil Procedure section 437c, subdivision (d) provides that opposing affidavits or declarations must "set forth admissible evidence."

(122 Cal.Rptr. 872, 537 P.2d 1232)]; *People* v. *DeWitt* (1983) 142 Cal.App.3d 146, 151 [190 Cal.Rptr. 726]; *Hart* v. *Wielt* (1970) 4 Cal.App.3d 224, 229 [84 Cal.Rptr. 220]; *People* v. *Hardy* (1969) 271 Cal.App.2d 322, 327 [76 Cal.Rptr. 557]; *People* v. *Crooks* (1967) 250 Cal.App.2d 788, 791-792 [59 Cal.Rptr. 39].)

■ While plaintiff's evidence is far from overwhelming, it is sufficient to raise a question of fact as to whether a dangerous activity was being maintained and conducted on defendants' premises at the time of the shooting. ■ It is not the function of a summary judgment proceeding to decide issues of fact, merely to ascertain whether issues of fact exist to be tried. (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441 [116 P.2d 82].) ■ "Counteraffidavits are sufficient if they *disclose* evidence supporting *a possible defense or cause of action*; they need not, at this stage, prove anything. . . . ■ And, contrary to the rule governing the moving party's affidavit, the counteraffidavit is *liberally construed*. If, considered alone, it shows facts sufficient to constitute a cause of action or defense, its averments *must be accepted as true* for the purposes of the motion and summary judgment must be denied." (4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, § 191, pp. 2839-2940.) (See *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310]; *Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 437 [74 Cal.Rptr. 895, 450 P.2d 271].) ■ "Where affidavits have been submitted by the opposing parties, any doubts as to whether summary judgment is proper should be resolved against the moving party. [Citation.]" (*Buehler* v. *Oregon-Washington Plywood Corp.* (1976) 17 Cal.3d 520, 526 [131 Cal.Rptr. 394, 551 P.2d 1226].)

■ Under the circumstances, we conclude that the trial court erred in sustaining the motion for summary judgment as to the second cause of action.

The judgment is reversed.

Stephens, J., and Ashby, J., concurred.