[No. G019117. Fourth Dist., Div. Three. Nov. 30, 1999.]

ERIC J., a Minor, etc., Plaintiff and Appellant, v.
BETTY M. et al., Defendants and Appellants.

**COUNSEL**

Allred, Maroko & Goldberg and Lisa Bloom for Plaintiff and Appellant.

Dennison, Bennett & Press, James H. Goudge and Michael A. Tudzin for Defendants and Appellants Betty and Edwin M.

James A. Testa and Gregory J. Testa for Defendants and Appellants Frank and Jean M.

William B. Craig for Defendants and Appellants Phillip and Eddie M.

## OPINION

**SILLS, P. J.**—When Robert was released from prison on rehabilitative parole after having been convicted of felony child molestation four years earlier, his family might have disowned him, but they didn't. They accepted him back. And when he found a girlfriend named Helen—who had an eight-year-old boy named Eric—they did not tell Helen about Robert's previous conviction, no doubt hoping against hope that he had reformed himself.

Unfortunately, and unbeknownst to any members of the family or Helen herself, Robert began molesting Helen's son early on in his relationship with her. Helen, acting as Eric's guardian, has now sued various members of Robert's family for not telling her of his previous conviction. Because some of the sexual abuse occurred on property owned by family members, Helen has asserted premises liability as well as general negligence as her two theories of liability.

The trial judge granted the family members' motion for nonsuit, and we now affirm the ensuing judgment. ■ As we explain below, under the circumstances of this case, premises liability is a make-weight because there was no relationship between the harm and any premises owned by family members on which the harm occurred. The state was willing to take a chance on Robert by releasing him on parole, and so were his family members by accepting him back, so he cannot be legally equated, as Helen would have us do for purposes of premises liability, to a dangerous animal.

■ As to general negligence, the family members cannot be held liable for their "nonfeasance" in failing to warn Helen because to do so would contravene one of the most important, long standing, and recently reaffirmed principles of American tort law: You are not responsible for mere inaction without some sort of special relationship which creates a duty to take some action; the law does not require people to be Good Samaritans (i.e., the traditional "no duty to aid" rule).

### FACTS AND LITIGATION BACKGROUND

In 1978 Robert was arrested for the misdemeanor of "annoying" a minor. He pled no contest and served six months, and was on probation for the next three years.[1] During that time he committed one probation violation for taking four high school freshman boys to dinner without supervision. Again he served some time in jail and was placed on probation.

---

[1]See Penal Code section 647.6, formerly Penal Code section 647a, making it a misdemeanor to "annoy[] or molest[]" any child under the age of 18.

Then in 1984 he was arrested for molesting a 10-year old boy. He again pled no contest, this time to a felony count of violating Penal Code section 288, subdivision (a) (lewd or lascivious act with or upon body of child under the age of 14). He served four years in state prison, getting out in August 1988.

In June 1989, Robert met Helen and her eight-year-old son Eric at Magic Mountain. A relationship developed between Robert and Helen, and, by Thanksgiving 1989, Robert invited Helen and Eric for an overnight stay at the home of his mother Dorothy in Big Bear so she and Eric could meet some of the rest of his family.

Besides Dorothy, Robert's family consists of his father Edwin, his father's wife Betty, Robert's three brothers Frank, Phillip and Eddie, Frank's wife Jean, and a sister named Diane. Dorothy and Diane are not parties to this appeal.[2]

The members of Robert's family concluded that Helen was his "girlfriend." Their relationship continued until early 1992, when Robert moved to Las Vegas.

Later that year, one of Helen's friends saw a special on television regarding convicts on parole, which showed a picture of a younger, beardless Robert and revealed that he was a convicted molester.[3] She told Helen about the program, and a few days later, Helen took Eric to a police station. There, Helen learned that Robert had been molesting Eric. In June 1993 Robert was convicted of 23 counts of child molestation. He had never told Helen of his criminal history.

Helen, acting as guardian ad litem for Eric, sued various members of Robert's family. The case came to trial, during which it was learned that on several occasions Eric was molested on property owned by some of Robert's family members: Eric was molested at the Huntington Harbor home of Robert's father Edwin during a Christmastime gift exchange; Robert molested Eric for about two minutes while the two of them were apart from the others in a room where Frank and Jean's baby was sleeping. There were

---

[2] Dorothy once left Robert and Eric alone in her house to go walk her dogs after Robert went there to fix her television. She did not receive the benefit of the nonsuit granted the other family members. We are informed in the opening brief that the jury awarded $200,000 and that the judgment has been satisfied. In this appeal, there are three sets of defense counsel: one for Edwin and Betty (Robert's father and father's wife); one for brother Frank and Frank's wife Jean, and one for the two brothers Phillip and Eddie.

[3] The friend would later testify. Her testimony seems to indicate that the point of the television special was that there was only one parole officer to supervise 100 convicts.

several other occasions when Eric was similarly[4] molested by Robert at Edwin and Betty's house, but the record does not reveal any more details (Eric could not recall any). Eric was also molested twice on a yacht owned by Edwin and Betty that was moored near their home. Once it was in the "driver's area" of the vessel, at a time when only Robert, Eric and a friend of Eric's named Jeff were around, and Jeff was cutting a rock with a rock cutter in front of the home, unable to see what was going on. Another time it was in the engine room of the yacht at a family gathering, when most of the members were on the dock; again the molestation lasted about two minutes.

Besides being molested at the home of Edwin and Betty several times, Eric was quickly molested once at each of the homes of Robert's three brothers: There was a birthday party at Phillip's house; the molestation took place in an entertainment room while the rest of the clan were in various other rooms. Another molestation occurred at brother Eddie's house, when Robert and Eric came to pick up some "stuff" Robert owned; at the time Eddie was working on his stereo. Similarly, when Robert and Eric came over to pick up some stuff from the home of brother Frank and his wife Jean that Robert had left, Robert molested Eric in the garage while Frank and Jean were in the house.

Each of the relatives had various degrees of knowledge of Robert's history. Father Edwin knew the most. He knew about the 1978 and 1984 convictions. Robert came to live with him and Betty for a short period after Robert's release from prison in 1988, and was visited by a parole officer shortly thereafter; she told Edwin that in her opinion Robert was a "pedophile." The parole officer also told Edwin that Robert had agreed to be put on a state parole rehabilitation program obligating him to report for psychiatric counseling, obtain gainful employment, not be alone with an unsupervised child, and allow for unannounced inspections of his residence. Edwin told Betty about the visit and the conversation.

Edwin also believed that his son was, as he would later testify in trial "truly repentant of his unfortunate situation back in 1984, that he was trying to adhere to his parole very, very vigorously." Indeed, Robert had voluntarily "participated" in the television special regarding convicts on parole against his father's advice because, as he told his father, "Dad, I want to do it to show we can succeed . . . ."

The parole officer also visited brother Frank and his wife Jean when she learned that Robert was going to live with them for a while. She told them

---

[4]The record indicates that all these molestations consisted of Robert orally copulating Eric for about two minutes.

that Robert was a sex offender and reiterated the same parole conditions she told Edwin.

Brother Eddie learned sometime in 1989 or 1990 that Robert had been incarcerated on a molestation charge, and "wished to find out no more about it." By contrast, Robert's youngest brother Phillip thought that Robert had been in jail for kidnapping a child and understood he was on parole for that offense. He would later testify that he had "no knowledge that Bob was a felon."

The testimony was uncontroverted that none of the defendant family members ever told Helen about Robert's convictions.

After the evidence had been completed the trial court granted nonsuit motions made by the defendants in this appeal; Helen then filed a timely notice of appeal from the judgment in their favor. On appeal Helen now argues that the evidence was susceptible to liability based on either premises liability or general negligence theories.

DISCUSSION

*Premises Liability*

The most common situation where landowners may be held liable in tort for the criminal actions of another person on their property merely because of their status as landowners entails commercial, business or otherwise public property, with the criminal action being tied in some way to either the nature of the business or the property, and in a context where the actual perpetrator of the crimes was personally unknown to the landowner. (See, e.g., *Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112 [211 Cal.Rptr. 356, 695 P.2d 653] [attack in hospital parking lot where emergency room in high-crime area drew persons under influence of drugs or alcohol]; *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447] [condominium homeowners association could be held liable for rape in plaintiff's unit because of lack of exterior lighting where project had already been scene of an " 'exceptional crimewave' "]; *Winn* v. *Holmes* (1956) 143 Cal.App.2d 501 [299 P.2d 994] [restaurant could be held liable for assault on one patron by another]; *Wallace* v. *Der-Ohanian* (1962) 199 Cal.App.2d 141 [18 Cal.Rptr. 892] [summer camp could be held liable for attack by unknown assailant on girl staying at camp because of lack of supervision of child]; *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798 [142 Cal.Rptr. 487] [landlord liable for not warning tenant that a rapist had already assaulted several

female tenants]; *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324 [176 Cal.Rptr. 494] [owners of apartment building in high-crime area liable for assault where they had notice of previous attack on tenant and that other tenants feared for their own safety]; *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200 [223 Cal.Rptr. 645] [owner of public rest stop could be liable for sexual assault by assailant hidden in women's rest room because it was "dismally predictable that where there are highways there will be highwaymen—and worse"]; *Onciano* v. *Golden Palace Restaurant, Inc.* (1990) 219 Cal.App.3d 385 [268 Cal.Rptr. 96] [attack on restaurant patron coming out into unlighted, unguarded parking lot];[5] *Cantwell* v. *Peppermill, Inc.* (1994) 25 Cal.App.4th 1797 [31 Cal.Rptr.2d 246] [dram shop statute did not preclude liability of bar for attack on one patron by drunken assailant]; *Zuniga* v. *Housing Authority* (1995) 41 Cal.App.4th 82 [48 Cal.Rptr.2d 353] [owner of public housing project could be held liable for arson committed by gang members who harassed particular tenants who complained about gang activity].)

In "public" or business property, liability has been allowed when there is something foreseeably dangerous about the nature of the activity conducted on the property or the property itself which fixes on the landowner the duty to take some sort of precaution (e.g., *Cantwell* [operation of a bar]). Or the *area* may be such that the presence of miscreants is generally a foreseeable risk (*Isaacs* [drug addicts drawn to emergency room in high-crime area], *Francis T.* [project was experiencing "crimewave"], *O'Hara* [rapist targeting females in particular apartment complex], *Kwaitkowski* [high-crime area, previous attack], *Constance B.* [highways breed "highwaymen"], *Zuniga* [gangs in public housing project]), and *Onciano* [unguarded parking lot late at night[6]]), or the owner has in some way undertaken, as part of the organized activity on the land, care for the safety of the plaintiff as against criminal acts of third parties (*Wallace* [summer camp] and *Winn* [restaurant]).

---

[5]The viability of the holding in *Onciano* is questionable in light of the subsequent Supreme Court decision in *Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207]. *Onciano* relied on *Isaacs* v. *Huntington Memorial Hospital, supra*, 38 Cal.3d 112 to reject the idea that a lack of prior criminal activity was not dispositive in the landowner's favor, a fact which Justice Fred Woods would find troubling in a separate concurring opinion, where he lamented *Isaacs*'s "broad brush dicta." (See *Onciano* v. *Golden Palace Restaurant, Inc., supra*, 219 Cal.App.3d at pp. 396-397 (conc. and dis. opn. of Woods (Fred) J.).) Liability in the face of the absence of notice of prior criminal activity, however, *was* dispositive in favor of the landowner in *Ann M.*, a rationale which Justice Mosk, in his dissent in *Ann M.*, criticized as being inconsistent with *Isaacs*. (See *Ann M., supra*, 6 Cal.4th at pp. 680-683 (dis. opn. of Mosk, J.).)

[6]As mentioned above, *Onciano* may not be viable in light of the subsequent case of *Ann M.* Assuming that is, however, the essential rationale of the opinion goes to the nature of the property. The court reasoned, rather similar to *Constance B.*, that the presence of unattended cars on a parking lot late at night would act as a magnet for criminal activity. (See *Onciano* v. *Golden Palace Restaurant, Inc., supra*, 219 Cal.App.3d at p. 393.)

The need for a connection to the actual property itself, or some activity organized upon it, is underscored by the rationale in cases where *no* liability has been allowed. Absence of actual notice of any prior incidents on the property was dispositive in *Sharon P.* v. *Arman, Ltd.* (1999) 21 Cal.4th 1181 [91 Cal.Rptr.2d 35, 989 P.2d 121] (absence of any assaults in previous 10 years of operation of underground parking garage), in *Ann M.* v. *Pacific Plaza Shopping Center, supra,* 6 Cal.4th 666 (lack of any notice by the landowner of any prior similar incidents in the subject shopping center), and in *7735 Hollywood Blvd. Venture* v. *Superior Court* (1981) 116 Cal.App.3d 901 [172 Cal.Rptr. 528] (an apartment owner could not be held liable where there was no allegation that any crime had previously occurred on the premises), which appears to have adumbrated *Sharon P.* and *Ann M.* Likewise, occurrence of the crime *off* the premises was dispositive in *Steinmetz* v. *Stockton City Chamber of Commerce* (1985) 169 Cal.App.3d 1142 [214 Cal.Rptr. 405] (no liability because the assault took place in a parking lot which was *not* owned, possessed or controlled by the defendant), *Medina* v. *Hillshore Partners* (1995) 40 Cal.App.4th 477 [46 Cal.Rptr.2d 871] (owner of an apartment complex could not be liable for an assault off the property, even though it allowed gang members to congregate on the property) and *Rosenbaum* v. *Security Pacific Corp.* (1996) 43 Cal.App.4th 1084 [50 Cal.Rptr.2d 917] (owner of an apartment building could not be liable for an attack which occurred across the street from the victim's apartment [even though the victim had parked there precisely because the apartment's garage was unsafe]), again emphasizing the need for a connection to the property itself.

As one might expect, far fewer cases involve criminal activity occurring on nonpublic residential property against social guests of the owners who live or whose tenants rent there. The typical case of premises liability in the residential context is, of course, the standard slip and fall or some other occurrence arising out of the condition of inanimate matter on the property. (E.g., *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] [faucet handle broke off in hand of social guest].) There do not appear to be many cases in the area involving the question of liability on the part of a landowner *qua* landowner for the criminal acts of *unknown* third persons, probably because, in the social guest-residential property context, landowners themselves actually live on the premises and are just as interested in not being assaulted as their guests.

One case relied on by Helen involving the guest-residence scenario, *Pamela L.* v. *Farmer* (1980) 112 Cal.App.3d 206 [169 Cal.Rptr. 282] (wife of sexual offender could be held liable for offenses he committed against neighborhood girls invited onto property by wife), is not really a premises liability case at all—the opinion does not even mention whether the defendant there had an ownership interest in the property though the criminal acts

there did occur in her home—and to the degree that it may be so construed, is based on the idea of the relationship of *entrustment* of a child which animated *Wallace*, the summer camp case. (See *Pamela L., supra*, 112 Cal.App.3d at pp. 211-212, and citing *Wallace v. Der-Ohanian, supra*, 199 Cal.App.2d at p. 144.) We address *Pamela L.* again in our discussion of general negligence.

The plaintiff in another guest-residence case, *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 [46 Cal.Rptr.2d 73], foundered, as did the plaintiff in the commercial case of *Ann M.*, on the defendant's actual lack of notice of the danger. In *Chaney*, a man molested a neighborhood girl in his home, but the defendant wife had no actual knowledge of her "husband's deviant propensities" so there was no foreseeability. (*Id.* at pp. 157-158.)

*Anaya v. Turk* (1984) 151 Cal.App.3d 1092 [199 Cal.Rptr. 187] is the closest case we have found in the area because it implicates, though it does not address, the relatively complex problem which the parties have now set before us: What is the liability of a landowner *qua* landowner for criminal acts committed against a guest by another guest because of the criminally acting guest's prognosticated criminal "propensities"? It is a complex problem because it involves nothing less than whether landowners can incur tort liability for failing to predict the actions of a real, flesh-and-blood human being, not just a *general* threat of crime based on the laws of probability given statistics that the property is in a "high-crime area." And it is *not* a problem governed by our Supreme Court's famous decision about the future acts of a specific human being in *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] (psychologist could be held liable for failing to warn victim of mental patient who made threats against her), because the holding in the *Tarasoff* case was predicated on the fact the human being who committed the crime actually confided an *intention* to commit the crime prior to doing so (see *id.* at p. 430) and the psychologist to whom the confession was made was able to "in fact predict" the future occurrence of the crime. (See *id.* at p. 438.) In the present case, by contrast, there is no evidence that Robert confided any intention to anybody to molest Eric; indeed, from what he told his father it is clear that he was just as intent on keeping his molestations of Eric secret from his family as from Helen.

*Anaya*, however, is of only limited use on the point. There, the defendants invited both the plaintiff and another guest, who was an ex-convict, to their apartment. The reason they invited the ex-convict was to sell drugs to him. The ex-convict turned violent, and shot both the plaintiff and one of the defendants. The plaintiff asserted two causes of action based on two theories

of liability: (a) the defendants had a duty to warn him of the other guest's "criminal propensities"; and (b) the defendants were conducting an activity—drug dealing—which increased the risk of harm to the plaintiff. (See 151 Cal.App.3d at pp. 1097, 1101.)

The *Anaya* case came to the Court of Appeal after summary judgment, and the court *affirmed* the judgment as to the first theory (failure to warn)—which it styled as based on "mere nonfeasance (failure to intervene for the benefit of plaintiff)," reasoning that "as a matter of law" the defendants' "generalized knowledge" of the ex-convict's criminal history could not support a finding of foreseeability. (See 151 Cal.App.3d at pp. 1100-1102.) "Mere knowledge that [the ex-convict] had been in federal prison did not constitute reasonable cause to anticipate his violent conduct," said the court. (*Id.* at p. 1101.)

The Court of Appeal reversed, however, as to the second cause of action predicated on the dangerous activity of drug dealing, because, as one expert stated in a declaration opposing the summary judgment motion, it is "a common occurrence in drug transactions that the person buying the drugs will attempt to take them by force without paying for them, and will shoot or kill anyone in his way." (See 151 Cal.App.3d at p. 1105.)

While the holding of the *Anaya* case on the first cause of action would appear to be dispositive of any premises liability of brother Phillip, who had only the most "generalized knowledge" of Robert's past crimes, it does not speak to the other defendants here, who all knew at least (in contrast with the defendants in *Anaya*) what Robert had been convicted of. Nor is its holding on the second cause of action much use: Family gatherings are most assuredly not drug deals, and there is nothing in this case to suggest that—absent the mere fact the Robert and Eric (and often Helen) would show up together—there was any *activity conducted by any of the defendants* on the premises that would increase the risk. Robert's family could hardly be responsible for supervising him every moment during an innocent family gathering such as a Christmas gift exchange.

What *Anaya* does is to make reference to the plaintiff's "contention" that the ex-convict's "dangerous propensities" (the phrase is used at least three times, see 151 Cal.App.3d at pp. 1098-1100) established some sort of duty on the part of the landowner, though the opinion never explores the idea of the "dangerous propensities" of specific human beings in detail.

There was obviously a subtext, however, that ran through the plaintiff's argument in *Anaya*, that Stanley Wilson—the ex-convict in the case—was

the functional equivalent of a dangerous animal. The argument is even closer to the surface in the present case, where the leitmotif of Helen's appellate argument is that Robert—because he had once been convicted of felony child molestation and once been convicted of misdemeanor annoyance of a child[7]—was, when he was on the defendants' property, to be treated as if he were a vicious pit bull, for whom a landowner might be liable just for allowing it on the landowner's property.

Now, maybe in retrospect Robert *was* the *moral* equivalent of a vicious pit bull, and there is no doubt that, as a sex offender, he represented a threat. (See *Wright* v. *Superior Court* (1997) 15 Cal.4th 521, 524 [63 Cal.Rptr.2d 322, 936 P.2d 101].) But to say that his convictions made him—for purposes of the tort liability of his fellow family members who didn't turn him away after his crime—the equivalent of a brute beast without the capacity to repent, does not square with the parole scheme under which Robert was released.

The academic criminologist, James Q. Wilson, once observed that belief in rehabilitation "requires not merely optimistic but heroic assumptions about the nature of man."[8] It may have been woolly thinking to release Robert in 1988, but he *was* released, and released under the auspices of a state parole *rehabilitation* program. Perhaps when he was convicted of felony child molestation in 1984 he should have been incarcerated for life without possibility of parole (i.e., locked up and the key thrown away),[9] but that was not what the law of criminal sentencing provided. When Robert was released rehabilitation was the goal, and it cannot be said as a matter of law, even in the case of individuals who have been convicted of felony child molestation, that the rate of recidivism in such cases is 100 percent. The legislative goal of rehabilitation—embodied in the very fact that Robert was indeed released on parole—cannot be squared, for purposes of landowner liability, with the assumption that Robert was the legal equivalent of a dangerous animal.

The problem of predicting when a specific convict will again commit a crime was confronted by our Supreme Court in *Thompson* v. *County of*

---

[7] Words are important, exact language makes a difference, and sometimes, Strunk and White notwithstanding, it is better to use more words than less. It would be easy to write that his family knew that Robert was a "child molester," but in the context of the law in this case, it would be inaccurate and would convey an idea that is not supported by the record, namely that they were aware of the molestation of Eric as it happened. What they knew, precisely, is that their relation had been convicted of the crime of child molestation.

[8] See Boldt, *Rehabilitative Punishment and the Drug Treatment Court Movement* (1998) 76 Wash. U. L.Q. 1205, 1306, referencing Lipton, The Effectiveness of Treatment for Drug Abusers Under Criminal Justice Supervision 3 (1975) page 14.

[9] For a bibliography of academic critics of rehabilitation, see Norris and Peters, *Fiscal Responsibility and Criminal Sentencing in Illinois: The Time for Change Is Now* (1993) 26 J. Marshall L.Rev. 317, 361, footnote 69.

*Alameda* (1980) 27 Cal.3d 741 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701] (albeit not in the context of premises liability), which involved stronger facts than those before us. There, a county released a juvenile offender with " 'latent, extremely dangerous and violent propensities regarding young children' " (as he was described in the complaint) on temporary leave to his mother's custody even though the county *knew* that he would, if released, " 'take the life of a young child residing in the neighborhood.' " (*Id.* at p. 746.) After the offender did just that, and murdered a child of neighbors just a few doors down, the parents of the victim sued the county for failing to warn them of the offender's " 'propensities.' " (*Ibid.*)

The Supreme Court affirmed a judgment after a demurrer was sustained without leave to amend, and specifically tackled the "troublesome" (see 27 Cal.3d at p. 749) problem of whether the county had a duty to warn. Justice Richardson, writing for the court majority, first noted that "a large number of parole violations occur." Releasing the offender was fraught with the possibility of recidivism. (See *id.* at p. 753.) But the fact that the Legislature had provided for parole and probation release programs showed that it was willing to accept the risk the " 'rehabilitative effort will fail' " to gain the benefit that at least some parolees would be returned to a "productive position in society." (*Ibid.*) Because the case involved only "*nonspecific threats of harm directed at nonspecific victims*" (see *id.* at p. 754, original italics),[10] the court concluded that as a matter of law there was no duty on the part of the county to warn of the release of "an inmate with a violent history." Essentially, noted the court, the Legislature had made a value judgment, and that judgment had certain consequences: "Obviously aware of the risk of failure of probation and parole programs the Legislature has nonetheless as a matter of public policy elected to continue those programs even though such risks must be borne by the public. [Citation.]" (*Ibid.*)

If the Legislature was prepared to accept the *possibility* of Robert's rehabilitation, he cannot be equated with an inanimate, dangerous condition, or that of a dangerous animal. This is not a case of keeping a dog which is likely to attack someone on a piece of property. (E.g., *Portillo* v. *Aiassa* (1994) 27 Cal.App.4th 1128 [32 Cal.Rptr.2d 755] [commercial landlord had duty to inquire as to nature of dog guard kept by commercial tenant].)

Given that Robert's mere presence on the property cannot be considered a dangerous condition of the property, there is no basis for premises liability.

---

[10]A fact which the court used to distinguish the case from *Tarasoff.* (See *Thompson* v. *County of Alameda, supra,* 27 Cal.3d at p. 753.) Justice Tobriner, in his dissenting opinion, read *Tarasoff* rather more broadly than the majority, concluding that it encompassed generic "predictions of danger" as distinct from threats at specific individuals. (See *Thompson, supra,* 27 Cal.3d at pp. 763-764 (dis. opn. of Tobriner, J.).)

Nor do any of the other bases for premises liability apply. There was nothing about the nature of any activity conducted on the property to implicate such liability—again, family gatherings cannot be equated with drug dealing or operating a bar open to the public. Nor was there anything about the nature of any of the properties owned by the defendants to implicate liability—they were just homes, and in the case of Robert's father, a yacht. Nor was there any relationship of *entrustment of a child* by virtue of an activity conducted on the premises, such as happened in *Wallace*, the summer camp case. If anyone was responsible for Eric, even at the family gatherings or times when Robert came over to his brothers to pick up his "stuff," it was Helen. We therefore conclude that the trial court correctly granted the nonsuit motion as to Helen's premises liability theory.

### General Negligence

Absent a "special relationship," one cannot be held liable for mere nonfeasance, such as not protecting another from a criminal attack by a third party. (See *Totten* v. *More Oakland Residential Housing, Inc.* (1976) 63 Cal.App.3d 538, 541 [134 Cal.Rptr. 29] ["As a basic general principle, in the absence of a special relationship or circumstance, a private person has no duty to protect another from a criminal attack by a third person."].)[11] The basic idea is often referred to as the "no duty to aid rule," which remains a fundamental and long-standing rule of tort law. As the Supreme Court said in *Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]: "As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act." (See also *Anaya* v. *Turk, supra,* 151 Cal.App.3d at pp. 1101-1102 [first cause of action based on failure to warn, was at root "alleged liability on mere nonfeasance," which was defined as "failure to intervene for the benefit of plaintiff"].)

To the degree that Helen asserts a cause of action for negligence disconnected from premises liability, her claim essentially requires this court to depart from the rule against liability for mere nonfeasance. That rule is foundational in California tort jurisprudence. The tort law of California does not impose mandatory Good Samaritanism. (See generally, cases collected at

---

[11]*Isaacs* criticized as "fatally flawed" the requirement of "prior similar incidents" set forth in a series of Court of Appeal decisions, among which was *Totten*. (See *Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 125.) Some citators may therefore show it as overruled or disapproved, albeit on another point from the proposition for which we cite it here. However, in light of what *Ann M.* had to say about the need for prior similar incidents (see fn. 6, *ante*), it is questionable whether any designation that *Totten* had been disapproved is accurate.

6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 858, pp. 220-221; cf. also *People* v. *Heitzman* (1994) 9 Cal.4th 189, 213-215 [37 Cal.Rptr.2d 236, 886 P.2d 1229] [daughter could not be held criminally liable for failing to intercede against brothers' abuse of father because she had no legal duty to control their conduct].) In light of the reaffirmation of that rule as late as recently as 1983 in *Williams* (and impliedly in 1994 in *Heitzman* as well), we decline to do so.

Helen argues that *Soldano* v. *O'Daniels* (1983) 141 Cal.App.3d 443 [190 Cal.Rptr. 310, 37 A.L.R.4th 1183], modified the no duty to aid rule. As one commentator has noted, *Soldano* stands out as the *only* case in the United States during the 30-year period since the death of Kitty Genovese that could "be read" as adopting a duty to aid rule, though the commentator who made that statement also noted that the "court's apparent holding [was] to the contrary." (See Payne, *Linking Tort Reform to Fairness and Moral Values* (1995) 1995 Det. C.L.Rev. 1207, 1237 ["During this thirty year period only one case can be read as adopting a 'duty to aid' rule, despite the court's apparent holding to the contrary."].)

*Soldano* did not abrogate the rule against liability for mere nonfeasance. Rather like Justice Scalia's observation about the famous contracts case of *Hadley* v. *Baxendale* (1854) 156 Eng.Rep. 145, it is an instance of a court knowing the right rule but simply not applying it correctly.[12] The time has come to explain why the result in case is an aberration in American tort jurisprudence.

In *Soldano*, a saloon patron ran across the street to a restaurant to try to phone the police about a threat that had been made in the bar. The patron requested the bartender of the restaurant (in the fairly neutral language which the opinion used to describe the actual facts) to " 'either call the police or allow him to use the [restaurant] phone to call the police. That [bartender] allegedly refused to call the police and allegedly refused to allow the patron to use the phone to make his own call.' " (*Soldano* v. *O'Daniels, supra,* 141 Cal.App.3d at p. 446.) The threat in the saloon eventually escalated into a lethal shooting.

The appellate court reversed the judgment entered after a summary judgment motion when the son of the man who was shot and killed in the saloon sued the restaurant across the street. The appellate court began its substantive discussion by saying the "facts" of the case before it "come very nearly within section 327" of the Restatement Second of Torts, which the court then

---

[12]See Scalia, A Matter of Interpretation (Princeton U. Press 1997) page 6 ("the miller rather than the carrier *should* have won the case").

paraphrased for the rather noncontroversial point that if you know a third person is going to render aid to another you shouldn't "prevent[]" that person "from doing so." (See *Soldano* v. *O'Daniels, supra,* 141 Cal.App.3d at pp. 452-453.) The opinion then quoted from a scope note making the same point, except it added the idea that you shouldn't "interfere" with another person's attempt to give aid as well as "prevent" it. (*Id.* at p. 453.)

The problem with the court's analysis is that it subtly equated the concepts of prevention and interference as used in section 327 of the Restatement Second of Torts with the fact that the bartender had *refused to allow* a saloon patron from across the street use the *restaurant's* phone. Interference and refusal to allow one's property to be commandeered, even for a good purpose, are simply two different things. If the English words "prevent" and "interfere" still mean anything, they necessarily convey the notion of some sort of affirmative action, not just refusal to turn one's property over to someone else.[13]

In addition to *Soldano,* Helen also relies on *Pamela L.* v. *Farmer, supra,* 112 Cal.App.3d 206, which, as we noted above, is another general negligence case, not a premises liability one. In *Pamela L.,* the appellate court held that the wife of a "sexual offender [who] had molested women and children in the past" could be held liable for telling the parents of three children that it would be "safe for them to play at her house." (*Id.* at pp. 208, 212.) The court distinguished the case from the traditional "nonfeasance cases" because the wife's affirmative representations increased the likelihood of harm. (See *id.* at pp. 209-210.) Indeed, she specifically invited the children to her home and thereby "assumed" a "special relationship." (*Id.* at p. 211.) In essence, *Pamela L.* is a negligent or intentional misrepresentation case, not a failure to warn case at all. It is obvious that the wife in *Pamela L.* was seen by the court as functioning as a *procurer* of victims for her husband. Here, by contrast, Helen has pointed to no affirmative misrepresentations as to how "safe" Eric might have been if left alone with Robert; nor does she make any suggestion that family members were acting to facilitate any molestation.

Helen invites us to consider the duty question here under the traditional seven factors used by the courts. (E.g., *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1079-1080 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) That weighing process, however, has already been done by courts over the centuries in

---

[13]The *Soldano* opinion tried to distinguish between phones in private residences and phones in restaurants open to the public, but cited no statute or regulation that a restaurant's own phone (as distinct from, say, a pay phone in the bar or hallway that anyone could use) must be made available for emergency situations. (See 141 Cal.App.3d at p. 452.)

formulating the "no duty to aid" rule. We need only add that any result other than the one we reach today under the facts of this case would create intolerable conflicts of interest within families.

CONCLUSION

The judgment in favor of the respondents is affirmed. Because we affirm the judgment, the protective cross-appeal is moot.

Rylaarsdam, J., and Bedsworth, J., concurred.

On December 21, 1999, the opinion was modified to read as printed above. The petition of appellant Eric J. for review by the Supreme Court was denied March 15, 2000.