# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-00762-SCT

*SCOTT CORLEY*

*v.*

*JAMES F. EVANS AND STACY EVANS (HAMRICK)*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/4/2001 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | S. WAYNE EASTERLING |
| | EUGENE COURSEY TULLOS |
| ATTORNEYS FOR APPELLEES: | JOHN B. MACNEILL |
| | JASON SCOTCH EHRLINSPIEL |
| | ADAM BRADLEY KILGORE |
| | VICKI R. LEGGETT |
| | RANCE N. ULMER |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 01/16/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     After a judgment was entered in this premises liability case in accordance with a $2.5 million verdict in favor of plaintiff Scott Corley (Corley), the circuit court granted the motions for judgment notwithstanding the verdict (JNOV), filed by the landowners, James F. Evans (James) and his daughter Stacy Evans Hamrick (Stacy). Feeling aggrieved by this post-trial action by the trial court, Corley has appealed to this Court asking that we reinstate the initial $2.5 million judgment entered on the jury verdict. James and Stacy have cross-appealed, requesting that should this Court determine that the trial court erred in granting their

JNOV motions, this case should be reversed and remanded for a new trial based on alleged errors committed at trial. Finding that the JNOV was proper, we affirm the trial court's decision.

## INTRODUCTION

¶2. Corley was shot accidentally by a friend on the Evanses' land at a crawfish boil sponsored by Stacy Evans.[1] Corley brought suit for his injuries and damages sustained as a result of the shooting, and after a jury trial, the jury returned a jury verdict for $2.5 million in his favor, and the jury also assigned eighty percent (80%) liability to James, and twenty percent (20%) liability to Stacy.[2] Quite interestingly, those percentages corresponded to the percent of ownership each had in the land. Consistent with the jury verdict, the Circuit Court of Smith County, Honorable Robert G. Evans, presiding, entered judgment in favor of Corley and against James and Stacy in the amount of $2,000,000 (assessed against James) and $500,000 (assessed against Stacy). However, after post-trial motions were filed, Judge Evans, vacated the judgment via a grant of the JNOV motions filed by James and Stacy. On appeal, Corley argues that he met his required burden of proving that the accident was reasonably foreseeable and therefore the trial court erred in granting the JNOV. In the alternative, he urges this Court to reconsider current Mississippi premises liability law. James and Stacy cross-appeal requesting a new trial if the trial court's grant of the JNOV is reversed.

¶3. We find that the evidence was not sufficient to support the jury verdict in this case under current Mississippi premises liability law, which we decline to revisit; and therefore, the trial judge's grant of JNOV was correct.

---

[1] In a Motion to Compel filed in the case, Stacy Evans stated she was "erroneously referred to in the Complaint as Stacy Hamrick."

[2] See Miss. Code Ann. § 85-5-7 (1999).

2

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶4.     James owned a 1,000 acre tract of land in Smith County and had previously conveyed a twenty percent (20%) interest in 184 acres to his daughter, Stacy. The property was mostly pasture land on which was situated one barn. In 1990, Stacy began hosting crawfish boils on the land, and while the1993 event giving rise to this lawsuit was the eighth annual event, this was only Stacy's fourth time to actually host the crawfish boil. The land was never surveyed, so it was unclear whether the crawfish boil was held on the land in which Stacy had an interest. James's only involvement in the event was his brief attendance.

¶5.     On May 1, 1993, Corley attended the crawfish boil with his friends Eric Burton, Steve Harden,[3] and Jeff Crane. As the only one in the group 21 years old or over, Burton bought beer for them before they got to the festival. All four paid admission to the festival and then parked their two vehicles in the field. They intended to camp overnight and pitched a tent near their vehicles soon after they arrived, and then they began socializing with those assembled. It rained off and on through the night. All four were drinking beer before they arrived and continued their imbibing throughout the evening.

¶6.     Two weeks before the crawfish boil, Harden borrowed a .22 caliber pistol from Burton, who testified that he was uncertain as to why Harden wanted to borrow the pistol.[4] As Harden entered the gate onto the property where the crawfish boil was being held, the pistol was beside him on the driver's seat. Harden testified that he had unloaded the pistol the day before the crawfish festival and put the bullets in the ashtray of his car.[5] The pistol was taken out of the car on at least two occasions by different individuals.

---

[3]Harden's name is sometimes spelled "Hardin" in the trial record.

[4]Harden testified that he had borrowed the pistol "for protection, I guess you'd say."

[5]Harden believed the pistol to be unloaded, and no one could recall how the pistol ended up loaded, or who loaded it.

3

¶7.     Sometime after midnight, Harden shot Corley with the .22 pistol in the face below his left nostril, and the bullet lodged in Corley's skull. Harden testified that he had been holding the pistol for thirty minutes[6] or so when he slipped and fell backwards and the pistol discharged. Harden also testified as follows:

> Q: Mr. Harden, I believe it was your opinion or it's your opinion that this accident was caused by stupidity and the rain, right?
> A: Yes, sir. Mainly stupidity.
> Q: You slipped and the gun discharged, right?
> A: Yes, sir.
> Q: And it happened so fast that there wasn't anything that anybody could have done about it, right?
> A: Yes, sir.
> Q: You were surprised yourself?
> A: Yes, sir.
> Q: The accident – the unfortunate shooting was sudden and unexpected, was it not?
> A: Yes, sir.

¶8.     As a result of this tragic accident, Corley suffered severe permanent injuries, incurred extensive medical bills, was unable to complete his education, and was incapable of holding meaningful employment.

¶9.     As part of her hosting duties, Stacy distributed fliers for the event. Having hosted the last three events, Stacy knew that there would be alcohol consumption at the event. She posted a sign that said "No Alcoholic Beverages Permitted," she did not sell alcohol on the premises, and she did not attempt to verify the ages of the attendees.[7] She testified that she advertised campers were welcome, but she did not know how many patrons would camp because of frequent rains in the area. Stacy also provided two street lights to illumine the area but believed the lighting might have been reduced by the rains. Stacy originally called McDonald Security Service to provide security for the event; however, upon learning that this particular

---

[6]During his testimony, Harden equivocated as to how long the gun had actually been in his hand.

[7]The only beverage and food sold were soft drinks and red-beans and rice.

service was unavailable for the crawfish boil, Stacy contacted Vincent Security Service (Vincent Security). Stacy was familiar with the competence of the Vincent Security personnel because she had previously attended a party in Meridian at which Vincent Security had provided security and she was impressed with their performance. Also, Stacy had inquired of the host at the Meridian party as to her opinion of the capability of Vincent Security and received a favorable recommendation from the Meridian host.

¶10. The Vincent Security officers were dressed in uniforms resembling those worn by sheriff's department personnel. Stacy testified the only problem she had ever had at her three previous crawfish boils occurred during the very first one in 1990, when she had to call the sheriff's office to remove someone from her property. The instructions Stacy gave the security guards were "make sure everybody was okay." She also told them to walk around and keep a check on everything. Stacy did not know if the shooting occurred on her property or her father's property. She estimated 700 people were in attendance at the crawfish boil.

¶11. Stacy testified that she paid all the bills related to her portion of the land, including taxes and electricity, and that she took care of the place. She never asked her father's (James's) permission to have the crawfish boil. She considered the place hers, and she controlled the land. The crawfish boil was not her father's idea, he had nothing to do with the planning of the event, and he did not have any financial interest in the crawfish boil.

¶12. Stacy personally observed no fights or scuffles. She testified: "Everybody was having the best time. I mean, there were no problems anywhere at anytime. That's why this was such a shock." The only problem she had ever had was at her first crawfish boil when someone left his drunken brother-in-law on the premises and he would not leave. She testified she had no way to have possibly anticipated a shooting. James testified that he never discussed the crawfish boil with his daughter.

5

¶13.    Daniel Gray attended the crawfish boil and witnessed the shooting:

> Q: And what happened?
> A: And the gun went off.
> Q: And –
> A: And he hit the ground, and I took off running up the hill.
> Q: And why did you take off running?
> A: Because there was security guards all out through there, and I went and got one of them and told Stacy Evans that there needed to be the Sheriff's Department and an ambulance called.
> Q: Prior to the time that you and Mr. Corley had walked off from where the crawfish was being served down to your respective vehicle, had you seen security officers?
> A: Yes ma'am.
> Q: And where had you seen them?
> A: They were – there were some in the parking area, and there was one walking around on top of the hill up there where the dance was and the crawfish were.
> Q: Okay.  And do you recall what those security officers had on?
> A: I want to say they had – they had on brown uniforms with badges.
> Q: Prior to the time that this gun discharged, what, if any, altercation or fight did you observe between Mr. Corley and Mr. Hardin?
> A: I didn't see any.  I mean –which like I said, I wasn't with him the entire time.  I just – I guess you could say I was in the wrong place at the wrong time, because I just happened to run into him, and we walked down the hill, and that's when everything happened.
> Q: And would you describe the manner in which it happened?
> A: Shocking.  I mean – because there wasn't anybody screaming profanity acting a fool – I mean – it was just, hey, come here, I've got something for you, you know, and it just happened so quick I really couldn't tell you what kind of atmosphere I'd thought it would have been, because the way they called him over there it was kind of just like friends calling and talking to friends, you know.
> Q: How long were you at the crawfish boil prior to the shooting?
> A: I had been there probably since about 6:30 or so.
> Q: And how would you describe the behavior of the patrons in the crawfish boil?
> A: Everybody was having fun as far as I know.  I mean –
> Q: Prior to the shooting, Mr. Gray, did you ever see anybody exhibit a weapon?
> A: No.

¶14.　Ralph Day, president of Day Detectives security service, testified as an expert in premises security for James and Stacy and determined that the incident was not foreseeable. He based this conclusion on the fact that there was no history of crime at the crawfish boils, nor were there records of any arrests being made or law enforcement summoned other than one time. Day also testified that he believed three security guards for a crowd of under one-thousand (1,000) to be sufficient. Day stated, "You could have had 50 security guards, and virtually, if one had been standing in between them (Corley and Hardin), I don't think they could have prevented it. His friends couldn't prevent it. The Deputy Sheriff that testified yesterday couldn't prevent it, and he was just feet away."

¶15.　Keith Oubre, head of campus security for the University of Southern Mississippi, took the stand as Corley's expert. He opined that "three or four security guards would not be adequate for such an event of this size." Oubre testified there should have been more guards and they should have been given more explicit instructions days in advance. He also believed there was "virtually no" lighting where the shooting occurred and that with adequate lighting the shooting probably would not have occurred. During cross-examination, Oubre admitted he did not ask permission to enter the property for his investigation and conducted no written tests concerning the scene. He interviewed none of the security officers present on the day of the incident. Oubre would have recommended metal detectors be put in place for screening visitors to the crawfish boil, but stopped short of recommending closed-circuit TV. However, Oubre conceded on cross-examination:

> Q: We know, don't we Mr. Oubre, that security personnel cannot guarantee the safety of people attending events like crawfish boils, can they?
> A: No, they cannot.
> Q: Just like that police can't guarantee that, you know, we are all going to be safe out on the streets outside of our homes?
> A: Well, we can't guarantee that.

Q: Just like the campus security can't do that, either, can they?
A: Cannot guarantee it, no, sir.
Q: And we know, don't we, Mr. Oubre, that despite the best efforts of people sometimes at events like this, people get hurt, don't they?
A: Correct.
Q: And sometimes despite the best efforts of security people at – people become victims of crime at such events, don't they?
A: Correct.
Q: And sometimes they become victims of accidents where there's a bunch of security folks around?
A: That's correct.
Q: And sometimes they become victims of intentional acts, somebody meant to do something, where there's a bunch of security folks around?
A: That's correct.
Q: And that's true regardless of ever how many security people you've got, correct?
A: Correct.
Q: And that's true regardless of how good your lighting is at the scene where this thing happened, isn't that correct?
A: Correct
Q: And that's true also regardless as to how much or how little training the security people have had, correct?
A: Correct.
Q. And regardless of the security procedures that you may have had in effect, those things can happen, can't they?
A. Right. You can't guarantee people's safety regardless of all those things you've mentioned.
. . . .

Q. And it's also true that people get hurt and become victims of crime and become victims of intentional acts where there's alcohol involved regardless of the number of security people there, isn't that correct?
A. Correct.
Q. And that's true also – those things happen regardless of whether or not there's signs posted everywhere saying we don't want all of this to happen, isn't that correct?
A. Yes, sir.

## <u>STANDARD OF REVIEW</u>

¶16.    A motion for JNOV tests the legal sufficiency of the evidence supporting the verdict, not the weight of the evidence. *Tharp v. Bunge Corp*., 641 So.2d 20, 23 (Miss. 1994) (citing *Goodwin v. Derryberry Co.*, 553 So.2d 40, 42 (Miss. 1989); *Stubblefield v. Jesco, Inc.,* 464 So.2d 47, 54 (Miss. 1984)). *See also Stewart v. Gulf Guar. Life Ins. Co.*, 2002 WL 1874826, 6 (Miss. 2002).

¶17.    In *Goodwin,* we held:

> In deciding a motion for judgment notwithstanding the verdict, the trial court must consider the evidence in the light most favorable to the non-moving party, giving that party the benefit of all favorable inferences that reasonably may be drawn therefrom. The trial court should consider the evidence offered by the non-moving party and any *uncontradicted* evidence offered by the moving party. If the evidence thus considered is sufficient to support a verdict in favor of the non-moving party, the motion for j.n.o.v. must be denied.

*Goodwin*, 552 So. 2d at 42 (citing *Turner v. Turner,* 524 So.2d 942, 944 (Miss. 1988); *Read v. S. Pine Elec. Power Ass.,* 515 So.2d 916, 919 (Miss. 1987); *Baker Serv. Tools, Inc. v. Buckley,* 500 So.2d 970, 972 (Miss. 1987); *Paymaster Oil Mill Co. v. Mitchell,* 319 So.2d 652, 657 (Miss. 1975).

¶18.    We also held in *Goodwin* that, upon review by this Court, the same standard was applied whether JNOV was granted or denied by the trial court. *Goodwin*, 553 So.2d at 43.

¶19.    This Court held in *Fitzner Pontiac-Buick-Cadillac, Inc. v. Smith*, 523 So.2d 324, 326 (Miss. 1988):

> Two of the assignments of error are challenges to the sufficiency of the evidence to support the verdict of the jury. Our scope of review in such contexts is as limited as it is familiar. We consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are

required to reverse and render. On the other hand, if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. *See, e.g.,* ***Rester v. Morrow,*** 491 So.2d 204, 211-12 (Miss. 1986); ***Paymaster Oil Mill Co. v. Mitchell,*** 319 So.2d 652, 657 (Miss. 1975).

## DISCUSSION

**I.** **WHETHER THE TRIAL COURT PROPERLY GRANTED JUDGMENT NOTWITHSTANDING THE VERDICT.**

**II.** **WHETHER THE RECORD ESTABLISHES A BREACH OF DUTY BY EITHER JAMES OR STACY EVANS.**

¶20. We first must determine what duty was owed Corley by James and Stacy. This question can only be answered when we determine Corley's status as to James and Stacy. After those questions are resolved, we must ascertain, in the light most favorable to Corley, giving him the benefit of all favorable inferences that may reasonably be drawn from the evidence, whether there is substantial evidence in support of the verdict. Is the evidence of such quality and weight that reasonable and fair minded jurors, in the exercise of impartial judgment, may have reached different conclusions?

¶21. Mississippi adheres to the invitee/licensee/trespasser trichotomy when analyzing the property owner's duty of care. ***Hudson v. Courtesy Motors, Inc.*** 794 So.2d 999 (Miss. 2001). Thus, Corley's status as to James and Stacy determines what duty they owed to Corley. In ***Hoffman v. Planters Gin Co.*** 358 So.2d 1008, 1011 (Miss. 1978), we held:

> As to status, an invitee is a person who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage...A licensee is one who enters upon the property of another for his own convenience, pleasure, or benefit pursuant to the license or implied permission of the owner whereas a trespasser is one who enters upon another's premises without license, invitation, or other right.

10

(citing *Langford v. Mercurio*, 254 Miss. 788, 183 So.2d 150 (1966); *Wright v. Caffey*, 239 Miss. 470, 123 So.2d 841 (1960); *Kelley v. Sportsmen's Speedway,* 224 Miss. 632, 80 So.2d 785 (1955)).

¶22.    As to Stacy, Corley was an invitee. In order to create invitee status there must be a mutual advantage between landowner and invitee. Here, Stacy received a $7 admission fee from Corley, and Corley received the benefit of attending the crawfish boil. Therefore, there is a mutual advantage, and, invitee status is established on the part of Corley. The landowner is not an insurer of the invitee's safety, but does owe to an invitee the duty "to keep the premises reasonably safe, *and* when not reasonably safe, to warn only where there is hidden danger or peril that is not in plain and open view." (Emphasis added). *Caruso v. Picayune Pizza Hut*, *Inc.*, 598 So.2d 770, 773 (Miss. 1992), *citing* *McGovern v. Scarborough*, 566 So.2d 1225, 1228 (Miss. 1990).[8]  Along with that duty, is the duty of the landowner to protect invitees from injuries which are reasonably foreseeable. *Kelly v. Retzer & Retzer, Inc.*, 417 So.2d 556, 560 (Miss. 1982).

¶23.    We said in *Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc.*, 519 So.2d 413, 416 (Miss. 1988), that a tavern keeper can only be held liable where he had "cause to anticipate the wrongful or negligent act of [an] unruly patron." Here, we would hardly classify Stacy as a "tavern keeper," but regardless, the record does not reveal that she had any "cause to anticipate" violent behavior of her festival-goers at the crawfish boil.

----

[8]See however, *Tharp v. Bunge Corp.*, 641 So.2d 20, 25 (Miss. 1994), wherein we abolished the "open and obvious" defense as a complete bar, and invoked the application of our long-standing comparative negligence doctrine. Miss. Code Ann. § 11-7-15 (1972).

¶24. The introduction of the pistol into this case and one friend accidentally shooting another friend did not provide Stacy with adequate warning. Moreover, these events, both the mere presence of a pistol and the actual shooting, are not reasonably foreseeable. Additionally, Stacy employed three security guards to patrol the event. In three previous crawfish boils, only one fight had broken out. This prior altercation three years before the current situation was not adequate notice to Stacy that an intoxicated friend would accidently shoot another friend at the crawfish boil. Stacy simply had no "cause to anticipate" a negligent shooting based on one minor altercation at the three events she had sponsored.

¶25. As an important corollary to the landowner's duty, we have held repeatedly that owners are not insurers of an invitee's safety. *See Gatewood v. Sampson*, 812 So.2d 212, 219 (Miss. 2002); *J.C. Penney Co. v. Sumrall*, 318 So.2d 829, 832 (Miss. 1975); *Sears, Roebuck & Co. v. Tisdale*, 185 So.2d 916, 917 (Miss. 1966). Should we set aside the trial court's grant of the JNOV in this case, we most assuredly would be informing premises owners/landowners that they have now become the insurers of an invitee's safety.

¶26. In the recent *Gatewood* case, we upheld the trial court's judgment on a jury verdict of $308,000. In *Gatewood*, Roy Sampson (Sampson) had pulled into a service station owned by Jeff Gatewood (Gatewood). Sampson's purpose for being on the premises was to buy gas and use one of the pay phones; therefore, Sampson was clearly an invitee under our premises liability law. As Sampson was using the pay phone, he was attacked by a man with a gun, occupants from the car in which Sampson's assailant had exited fired upon both Sampson and his assailant as the two men struggled over the weapon, Sampson's assailant was killed from one of the shots coming from the car, and Sampson was struck in the back of the head by one of the bullets, but survived the attack. In citing *Lyle v. Mladinich*, 584 So.2d 397, 399 (Miss. 1991), we stated that:

12

[there are] two ways to establish legal causation, or foreseeability, in cases of assault by a third person. "The requisite `cause to anticipate' the assault may arise from (1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists [on the premises]..." *Lyle*, 584 So.2d at 399 (quoting *Grisham*, 519 So.2d at 416). Evidence of the existence of an atmosphere of violence may include "the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant's business premises, as well as the frequency of criminal activity on the premises." *Lyle*, 584 So.2d at 399.

*Gatewood*, 812 So. 2d at 220. Sampson offered evidence which revealed "that sixty violent crimes were reported to police in the neighborhood of the Ellis Isle Exxon [Gatewood's service station] within the three years prior to the attack. Thirty-two of those crimes reportedly occurred in the nearby Ellis Isle Shopping Center. Two incidents occurred in close proximity to the gas station: an armed carjacking occurred on the street in front of the station and a bullet fired from nearby entered the building. A fight also reportedly occurred in the Exxon parking lot." *Id.* We went further to distinguish the facts in *Gatewood* from those in *Crain v. Cleveland Lodge 1532, Order of Moose, Inc.*, 641 So.2d 1186, 1189 (Miss. 1994), in that Crain failed to offer evidence sufficient to establish proximate cause, whereas Gatewood offered sufficient evidence as to proximate cause and foreseeability so as to present a jury issue. 812 So.2d at 221. Without question, in comparing the "foreseeability" evidence presented in *Gatewood* with the evidence presented in the case before the Court today, Corley's evidence falls considerably short of that necessary to present a jury issue on foreseeability.

¶27. In referring to the "cause to anticipate" test quoted in *Lyle*, 584 So.2d at 399, Corley asserts that "an injured party can only recover after at least one violent act had already occurred, thereby placing defendant on notice of the dangerous condition." In the *Lyle* case, evidence was offered that between 1981 and 1989, numerous criminal charges were filed against persons in the tavern and the adjacent parking lot. In *Lyle*, we held that a jury question existed as to whether the property owners'

13

discontinuance of the use of security guards in their bar parking lot constituted negligence, in light of the fact that there had been a history of fighting outside the bar. That case is not analogous to the case sub judice as the facts are dissimilar. We held in *Lyle* that a fact question was created because there was an approximate nine-year history of arrests at the property in question. Moreover, *Lyle* involved a bar, opened with regular hours, while the case sub judice involved a tract of farm land opened once a year for a crawfish boil. Accordingly, for the reasons stated, the trial court properly granted Stacy's JNOV motion.

¶28.     As to James, Corley was a licensee; therefore, James only had the duty to refrain from willfully or wantonly injuring Corley. *Adams ex rel. Adams v. Fred's Dollar Store of Batesville*, 497 So.2d 1097, 1101 (Miss. 1986). James derived no benefit from the crawfish boil and was not involved in its promotion or staging. There is no evidence in the record that James willfully or wantonly injured Corley, or even had anything whatsoever to do with the crawfish boil, other than his brief attendance at the event. Thus, JNOV was likewise proper as to James.

### III.     WHETHER THIS COURT SHOULD CHANGE WELL SETTLED MISSISSIPPI PREMISES LIABILITY LAW.

¶29.     Corley urges this Court to adopt the "California Rule" of premises liability regarding third party conduct. Also, Judge Evans very eloquently conveyed his firm convictions in his Opinion and Order Granting Judgment Notwithstanding the Verdict. In what he understandably described as "an unpleasant decision," Judge Evans, stated, in part:

> [Scott Corley's] injuries are tragic, severe, and permanent. His life has been forever changed. If the jury's verdict were collected, occupational therapy might be afforded and his life made easier. Instead, in addition to the injustice of the first tragedy, this young Plaintiff must now suffer a second. And this one at the hands of our State's common law.

In his opinion and order, Judge Evans likewise requested this Court to consider adoption of the "California Rule" as to premises liability regarding third party conduct, which is a "totality of the circumstances" standard as opposed to a "cause to anticipate" standard.[9]

¶30.    The California Rule states:

> ...in determining the existence of a landowner's duty to protect invitees from the wrongful conduct of third persons, foreseeability is measured by all of the circumstances including the nature, condition and location of the defendant's premises and defendant's prior experience, bearing in mind that what is required to be foreseeable is the general nature of the event or harm, not its precise nature or manner of occurrence.

*Onciano v. Golden Palace Restaurant, Inc.*, 219 Cal.App.3d 385, 394, 268 Cal. Rptr. 96, 99 (Cal. Ct. App. 1990) (citing *Isaacs v. Huntington Mem'l Hosp.*, 38 Cal.3d 112, 129, 211 Cal.Rptr. 356, 695 P.2d 653 (1985)). *Onciano* and our reference to *Onciano* in our decision in *Crain* are the bases for the trial court's plea to this Court to revisit our premises liability law as to third party conduct. However, subsequent to the California Supreme Court's decision in *Isaacs* and a state district court of appeal decision in *Onciano,* the California Supreme Court revisited the issue of third party conduct premises liability in *Ann M. v. Pacific Plaza Shopping Center*, 6 Cal.4th 666, 678, 25 Cal.Rptr.2d 137, 145, 863 P.2d 207, 215 (1993),[10] and in doing so, admitted that certain broad language in *Isaacs*

---

[9] In *Crain v. Cleveland Lodge 1532*, *Order of Moose, Inc*., 641 So.2d 1186, 1190-91 (Miss. 1994), this Court declined a similar invitation to adopt the "California Rule." We recognized that the California experience revealed that the California courts eventually "stretched the `totality of the circumstances' test to the level of strict liability...." *Id*. at 1191.

[10] Our research on *Ann M.* reveals a "negative indirect history" which guides us to a California Supreme Court case, *Saelzler v. Advanced Group 400*, 25 Cal.4th 763, 767, 107 Cal.Rptr.2d 617, 619-20 23 P.3d 1143, 1145-46 (2001). A close study of *Saelzler* reveals that amendments to the California summary judgment statute (California Code of Civil Procedure § 437(c)), may have superceded certain language in various cases, including *Ann M.*; however, the statutory amendments relate to modification of an almost "impossible" burden of proof placed on the moving party to adoption of "the

had caused confusion in that there was at least an inference that analyzing foreseeability to determine duty by a premises owner was normally a question of fact to be determined by a jury, and that any such interpretation of *Isaacs* was error. The *Ann M.* court went on to hold that "[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court." 863 P.2d at 215. Recently, another California district court of appeal questioned the holdings in *Isaacs* and *Onciano*. In *Eric J. v. Betty M.*, 76 Cal.App.4th 715, 90 Cal.Rptr.2d 549, 554 (Cal. Ct. App. 1999), that court stated:

> The viability of the holding in *Oncianao* is questionable in light of the subsequent Supreme Court decision in ***Ann M. v. Pacific Plaza Shopping Center***, 6 Cal.4th 666, 25 Cal.Rptr.2d 137, 863 P.2d 207 (1993). *Onciano* relied on *Isaacs*, 38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653 to reject the idea that a lack of prior criminal activity was not dispositive in the landowner's favor, a fact which Justice Fred Woods would find troubling in a separate concurring opinion, where he lamented *Isaacs'* "broad brush dicta."......Liability in the face of the absence of notice of prior criminal activity, however, *was* dispositive in favor of the landowner in *Ann M.*, a rationale which Justice Mosk, in his dissent in *Ann M.* criticized as being inconsistent with *Isaacs*.........

Accordingly, it appears that the California courts have at least partially retreated from the ***Isaacs/Onciano*** pronouncements. In the end, we see no reason to endure the somewhat dis-jointed California experience and abandon our well-established premises liability law concerning third-party conduct.

¶31.    Returning to the case before us today, the record does not support a finding that the Evanses should have reasonably foreseen the third-party conduct of a drunken Harden who accidently shot his friend, Scott Corley.  The third-party assault by Harden upon his friend, Scott Corley, was not foreseeable because the requisite "cause to anticipate" did not arise since Stacy had "no actual or constructive knowledge of

---

federal mechanism of burden shifting" [in summary judgment motion hearings]. Accordingly,***Ann M.*** is still "good law" in California.

16

Harden's violent nature," or "actual or constructive knowledge that an atmosphere of violence existed" on her land at the crawfish boil.

¶32.    We conclude that no liability was imposed upon Stacy or James under our well-settled premises liability law.  We decline to adopt the California Rule in Mississippi, because that experience reveals that such a rule could ultimately create strict liability for property owners, causing them to become insurers of an invitee's safety.

### CONCLUSION

¶33.    While strongly urging this Court to revisit our premises liability law, the trial court boldly and firmly adhered to the law of this State in granting the JNOV and setting aside a judgment in the amount of $2,500,000, a judgment, which, as pointed out by the trial judge,  even if collected, would hardly be a start toward full compensation for Scott Corley based on the grievous injuries he suffered.   Were we to turn our heads away from the issue of liability in this case, Scott Corley would be entitled to the jury award, and more.  However in this imperfect world we are unable, as a matter of law, of awarding compensation for every injury which occurs in society.  Though Scott Corley proved his damages, we cannot reinstate the jury verdict based simply on whomever may have been named as defendants in this lawsuit.  Before the jury in any case can award damages, liability, as a matter of well-established law, must be proven as to one or more of the named defendants in the litigation. The trial court succinctly described in its opinion and order granting the JNOV motions, the "tragic, severe, and permanent" injuries inflicted upon Scott Corley, who was only nineteen years old at the time this tragedy occurred.  As noted above, the injuries and damages suffered by Scott Corley do not go unnoticed by this Court.  However, we are compelled to hold today that, based on the record before this Court and the applicable law, the trial judge properly granted judgment notwithstanding the verdict as to both James Evans and Stacy Evans because neither violated a

17

duty owed to Scott Corley under our premises liability law. We also decline to modify the invitee/licensee/trespasser trichotomy in Mississippi by adopting the "California Rule" regarding premises liability as to third-party conduct. As we affirm the grant of JNOV, the cross-appeals of James Evans and Stacy Evans are rendered moot. We affirm the trial court's order granting a JNOV for James Evans and Stacy Evans.

¶34.    **AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., WALLER AND COBB, JJ., CONCUR. DIAZ AND EASLEY, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., AND GRAVES, J., NOT PARTICIPATING.**