# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-00493-SCT

*JALENA TAYLOR AND BRIAN TAYLOR*

*v.*

*PREMIER WOMEN'S HEALTH, PLLC, AND
DONIELLE DAIGLE, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/2021 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | STEPHEN GILES PERESICH |
| | WILLIAM E. WHITFIELD, III |
| | KIMBERLY DAWN SAUCIER ROSETTI |
| | VICTORIA M. CHAMBERLAIN |
| | NICOLE WALL SULLIVAN |
| | WILLIAM FRANKLIN LONGWITZ |
| | DAVID A. BOWLING |
| | WHITMAN B. JOHNSON, III |
| | AMANDA B. SEYMOUR |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID A. BOWLING |
| | WILLIAM FRANKLIN LONGWITZ |
| ATTORNEYS FOR APPELLEES: | WHITMAN B. JOHNSON, III |
| | AMANDA B. SEYMOUR |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 07/21/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     This case involves a medical-malpractice suit brought by Jalena and Brian Taylor against Jalena's OB/GYN, Dr. Donielle Daigle, and her clinic, Premier Women's Health, PLLC.

## FACTS AND PROCEDURAL HISTORY

¶2.     Plaintiffs filed suit in the Circuit Court of the First Judicial District of Harrison County, Mississippi, on June 4, 2018, alleging medical negligence against Dr. Daigle and Premier. On February 17, 2017, Jalena was admitted to Memorial Hospital of Gulfport in active labor preparing to give birth. After pushing for two and a half hours, the baby's head became lodged in the mother's pelvis, and it was determined that a caesarean section was necessary.

¶3.     Following delivery of the child, Jalena's blood pressure dropped, and her pulse increased. The nurses worked to firm Jalena's uterus post delivery, but she continued to have heavy clots and bleeding. Jalena was given a drug to tighten the uterus, and an OR team was called to be on standby in the event surgery became necessary.

¶4.     Dr. Daigle called the OR team off after Jalena's bleeding was minimal, and her uterus remained completely firm. But Jalena's heart rate remained extremely elevated. Dr. Daigle allowed Jalena to go back to her room, and she checked her again, and the uterus was firm. A minute or two later, Jalena sat up and felt a gush of blood.

¶5.     It was documented that Dr. Daigle performed a sterile vaginal examination, although she does not recall exactly what she did. Another doctor, Dr. Alicia Ware, arrived at the hospital and performed a sterile vaginal examination to determine how much blood was

2

involved. At this point, Jalena's blood pressure dropped significantly, and her heart rate remained extremely elevated.

¶6. Dr. Daigle initiated an incision for exploratory laparotomy, and the uterus was exteriorized. There were only small points of bleeding noted from the uterine incision. The operative report notes:

> her uterus was still very atonic. The third dose of Methergine was given in the operating room and a dose of Hembate was injected into her uterus. Her uterus remained atonic even after massage. At this point we cannot see any further lacerations and decided that the only choice was to perform a hysterectomy if we cannot stop the atony and the bleeding.

¶7. Dr. Daigle and Dr. Ware made one last attempt directed at the uterine atony before proceeding with a hysterectomy by placing a liquid-filled balloon vaginally. While doing this, Dr. Daigle saw blood coming from a laceration in the cervix. Dr. Daigle attempted to repair the cervical laceration with sutures, but there was still bleeding. At this point, there was significant concern that given all the fluid and blood products Jalena had received, she would die of the bleeding, which now included blood from the completely flaccid uterus.

¶8. The balloon was unsuccessful, and the abdominal approach was resumed. Originally intended as a supracervical hysterectomy, it was found that the removal of the uterus did not stop the bleeding. There was still bleeding from the cervical area, which doctors decided they needed to amputate. Even after doing so, there was still bleeding because the laceration extended into the vagina. When the vagina was sutured and incorporated into the repair of the vaginal cuff, the bleeding finally stopped.

3

¶9.     The Taylors allege that Dr. Daigle failed to adequately treat Jalena and, as a result, she cannot have any more children.  A five-day jury trial was held in January 2021, and the jury returned a twelve-to-zero verdict in favor of Dr. Daigle and Premier. Final judgment was entered on February 8, 2021.

¶10.    The Taylors moved for a new trial and or a judgment notwithstanding the verdict on February 17, 2021. The trial court entered its order denying the motion on April 13, 2021. On May 3, 2021, the Taylors filed their notice of appeal.

¶11.    On appeal, the Taylors assert that the trial court committed reversible error by (1) refusing to grant their cause challenges of patients of Dr. Daigle and Premier, thus failing to give them a right to a fair and impartial jury; and (2) failing to find a deviation from the standard of care for failing to perform a proper inspection of a genital tract laceration.

**STANDARD OF REVIEW**

¶12.    "Since the determination of whether to grant or deny a new trial, on motion of a party or by order entered on the initiative of the court, is within the sound discretion of the trial court, [the Supreme Court] reviews such orders for abuse of discretion." *White v. Stewman*, 932 So. 2d 27, 33 (Miss. 2006) (citing *White v. Yellow Freight System, Inc.*, 905 So. 2d 506 (Miss. 2004)).

¶13.    An order granting a new trial gives the trial court "the discretionary authority to set aside a jury verdict and resubmit questions of fact to another jury[.]" *Id.*  In ordering a new trial, the trial court determines that "the jury verdict is in error, and that due to mistakes made

4

in conducting the trial, mistakes made in applying the law, or due to a jury verdict that is against the great weight of the evidence, a new trial is necessary." ***Id.***

## DISCUSSION

**I.** **Whether the trial court's refusal to strike jurors for cause as requested by Plaintiffs resulted in a prejudiced jury entitling them to a new trial.**

¶14. The question here is whether the trial court's denial of challenges for cause of two prospective jurors numbers 8 and 14, Omera Lofton and Carol Camp, were proper. According to the Taylors, if the trial court had simply granted those two challenges, a jury unconnected to Dr. Daigle or Premier could have been assured without denying The Taylors their fair allotment of peremptory challenges.

¶15. On voir dire, several prospective jurors identified themselves as patients of Dr. Daigle and/or Premier. The Taylors exercised challenges for cause on two prospective jurors who were then patients of Dr. Daigle. Although they expressed an ability to be fair, the court granted the cause challenges, acknowledging the physician-patient relationship.

¶16. Juror number 8, Omera Lofton, was a former patient of Dr. Daigle's. When asked if she could be fair, she replied that she could be. The Taylors' counsel did not ask Lofton any follow-up questions to better ascertain the extent of any treatment she received from Dr. Daigle. She was not asked if she would be going to Dr. Daigle anytime in the future. Lofton indicated that she could be fair and impartial.

¶17. The Taylors raised a cause challenge as to Lofton, but it was denied because Lofton said that she could be fair. The Taylors exercised a peremptory challenge to excuse her.

5

¶18. Juror Number 14, Carol Camp, explained that she had been to Premier in the past and had seen a colleague of Dr. Daigle's back in 2019 but could not remember his name. The Taylors' counsel did not question Camp about her experience with that colleague. Camp stressed that although she might go back to Premier in the future, this fact would not affect her one way or the other. The Taylors raised a cause challenge on Camp, but it was denied because Camp never had been a patient of Dr. Daigle herself. The Taylors' final peremptory challenge was used.

¶19. The Taylors allege that the trial court abused its discretion by failing to grant the challenges for cause even though they had a treatment relationship with Dr. Daigle and Premier, thus denying them an impartial jury. Had they been removed for cause, they claimed a jury could have easily been formed without costing the Taylors half of their peremptory strikes.

¶20. Rule 47(c) of the Mississippi Rules of Civil Procedure states that "in actions tried before a 12-person jury, each side may exercise four peremptory challenges." Miss. R. Civ. P. 47(c). This rule is in furtherance of a constitutional guarantee of the right of trial by an impartial jury, which is inviolate. Miss. Const. art. 3, §§ 26, 31. Under these constitutional provisions, "[it] is the duty of the court to see that a competent, fair and impartial jury is empaneled." *Marshall Durbin, Inc. v. Tew*, 381 So. 2d 152, 154 (Miss. 1980) (internal quotation marks omitted) (quoting *Miss. Power Co. v. Stribling*, 3 So. 2d 807, 845 (Miss. 1941)).

¶21.   The Taylors aver that these constitutional provisions provide the grounds for granting a new trial in a medical-malpractice case relying on *Hudson v. Taleff*, 546 So. 2d 359 (Miss. 1989).  In *Taleff*, the plaintiff challenged the jury members because certain members of the jury panel or their families had been patients of Dr. Taleff or his medical partners or represented by Dr. Taleff's attorneys or his partners. *Id.* at 361.

> Of the 40,338 qualified voters of Lauderdale County, ninety-two people were summoned for jury duty during the week of the trial of February 2, 1987; however, there was only a jury pool of twenty-five from which a jury could be selected. Of these twenty-five, twelve, or 48 percent, had some connection with Dr. Taleff, his medical partners or his attorney.

*Id.* at 361-62.

¶22.   The plaintiff challenged thirteen of the twenty-five member jury pool, and the trial judge excluded two of the thirteen prospective jurors challenged. *Id.* at 362.  On appeal, the plaintiff argued that the trial judge's failure to exclude more jurors required plaintiff to exhaust all peremptory challenges on persons who should have been removed for cause. *Id.*

¶23.   This Court found "because of the 'statistical aberration' of the makeup of the venire and the strong likelihood that the opportunity for undue influence over other jurors in this case was too great, this Court holds that the trial jury was not impartial. This case should be remanded for a new trial." *Id.* at 363.

¶24.   The Taylors aver that, unlike in *Taleff*, in which a statistical aberration would have required summoning other jurors or a significant expansion of the peremptory challenges in order to empanel a jury without connection to the defendant, here, no such aberration was present because plenty of jurors were available who had no connection to Dr. Daigle or

Premier. Yet they were required to exercise two peremptory challenges on patients who had either been seen by Premier or by Dr. Daigle personally.

¶25.   According to the Taylors, there was no assurance that these patients would not be returning for treatment to Premier or to Dr. Daigle, where the patients would be put in the awkward position of having to explain any verdict against these care providers.

¶26.   The Taylors contend that Lofton and Camp had a relationship with Dr. Daigle that was significantly closer than that of the prospective juror in *Scott v Ball*, 595 So. 2d 848, 851 (Miss. 1992).  Although the *Scott* Court did not find an abuse of discretion for failing to grant a challenge for cause of the juror whose son had been treated by the defendant physician, the Court did find that a challenge for cause for another juror should have been granted where members of the juror's family had been treated by the physician over the course of ten years. *Id.*

¶27.   The Taylors argue the mere existence of relationships between the family members and the defendant physician was enough to justify granting the challenge. *Id.* at 849.  The *Scott* Court noted that the court should give deference to an assurance of impartiality and also noted the court's discretion in managing challenges for cause. *Id.* at 850. However, where other available jurors unconnected are available, a rational cause challenge should be granted. *Id.*

¶28.   The Taylors also rely heavily on *Brown ex rel. Webb v. Blackwood*, 697 So. 2d 763, 769 (Miss. 1997), in which defendant physician asked the court to remove all prospective

jurors with whom the physicians' clinic had a treatment relationship. The court obliged, and that decision was affirmed on appeal. *Id.* at 771.

¶29. However, this Court has held that "[t]he selection of jurors is 'a judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion.'" *Id.* (quoting *Scott*, 595 So. 2d at 850).

¶30. Dr. Daigle avers that the Taylors have no valid claim to a fair and impartial jury because they were able to use their peremptory challenges with some left over to ensure there was no person on the panel with any connection to Dr. Daigle and Premier. Further, cases cited by the Taylors generally deal with situations in which the jury pool was such that even with all available challenges, a patient of the defendant was left on the jury, which was not the case here.

¶31. The trial court's decision not to strike Lofton and Camp for cause was clearly not an abuse of discretion. The Taylors had a fair and impartial jury with no juror connected to Dr. Daigle. There is no per se rule of disqualification due to a personal or professional relationship between party and proposed juror. *Toyota Motor Corp. v. McLaurin*, 642 So. 2d 351, 358 (Miss. 1994).

¶32. Each of the two prospective jurors in question stated they could be fair and impartial. "[J]urors take their oaths and responsibilities seriously, and when a prospective juror assures the court that, despite the circumstance that raises some question as to his qualification, this will not affect his verdict, this promise is entitled to considerable deference." *Scott*, 595 So.

2d at 850 (citing ***Harding v. Est. of Harding***, 185 So. 2d 452, 456 (Miss. 1966); ***Howell v. State***, 65 So. 641, 642 (Miss. 1914)).

¶33.    "[T]rial judges must scrupulously guard the impartiality of the jury and take corrective measures to insure an unbiased jury." ***Id.*** (alteration in original) (internal quotation marks omitted) (quoting ***Taleff***, 546 So. 2d at 363; ***Stribling***, 3 So. 2d at 810).

¶34.    The trial court went to great lengths to analyze the jurors, their demeanors, and their reactions to all questions posed to them during voir dire.  It carefully exercised its discretion and studied the issue of impartiality.  The court struck two other jurors who were current patients of Dr. Daigle, even though they assured the court they could be fair.  Therefore, we find  the trial court did not err by refusing to strike prospective jurors 8 and 14.

II.    **Whether the jury's verdict was so contrary to the overwhelming weight of the evidence that it must be reversed and remanded for a new trial.**

¶35.    This Court has explained that "in deciding a motion for judgment notwithstanding the verdict, the trial court must consider the evidence in the light most favorable to the non-moving party, giving that party the benefit of all favorable inferences that reasonably may be drawn therefrom." ***Solanki v. Ervin***, 21 So. 3d 552, 565 (Miss. 2009) (quoting ***Corley v Evans***, 835 So. 2d 30, 36 (Miss. 2003)).  If the moving party is not entitled to JNOV, the trial judge may grant a new trial if the verdict "is against the overwhelming weight of the evidence[.]" ***Bobby Kitchens Inc. v. Miss. Ins. Guar. Ass'n***, 560 So. 2d 129, 132 (Miss. 1989) (citing ***Adams v. Green***, 474 So. 2d 577, 581 (Miss. 1985)).

10

¶36.    A motion for new trial "is addressed to the discretion of the [trial judge.]" ***Amiker v. Drugs For Less, Inc.***, 796 So. 2d 942, 947 (Miss. 2000).  The appellate court will affirm a trial court's denial of a motion for JNOV "if there is substantial evidence to support the verdict."  ***Adcock v. Miss. Transp. Comm'n***, 981 So. 2d 942, 948 (Miss. 2008) (citing ***Johnson v. St. Dominics-Jackson Mem'l Hosp.***, 967 So. 2d 20, 22 (Miss. 2007)).

¶37.    The Taylors contend that the evidence was uncontroverted that not doing a vaginal inspection in a particular manner prior to taking Jalena to the operating room was a deviation from the standard of care.  Their expert, Dr. Jeffrey Koren, testified that the standard of care requires an obstetrician, when confronted with postpartum bleeding, to perform a careful examination through the vagina to rule out laceration of the genital tract.

¶38.    Dr. Koren based his testimony on *Williams Obstetrics* and found that Dr. Daigle did not perform the required thorough inspection of Jalena Taylor's vagina until her last-ditch effort to insert a balloon to control uterine atony in the midst of the exploratory laparotomy. The Taylors argue that Dr. Daigle's expert, Dr. Shoemaker, did not refute that a vaginal inspection is a frontline response to every case of postpartum hemorrhage. Dr. Daigle argues that she was under no obligation to challenge Dr. Koren's expert opinions with contrary expert testimony.  ***McCaffery v. Puckett***, 784 So. 2d 197, 205-06 (Miss. 2001).

¶39.    Rather, the Taylors contend that Dr. Shoemaker simply made the generic statement at the outset of his testimony that Dr. Daigle's performance was "exemplary." The Taylors rely on ***Butler v. Chadwick Nursing & Rehabilitation Center***, 223 So. 3d 835 (Miss. Ct. App. 2017), arguing that Dr. Shoemaker's testimony was conclusory.  In ***Butler***, the court

11

had granted a directed verdict when the opposing expert presented a conclusory opinion on the standard of care violation. *Id.* at 844.

¶40. Dr. Daigle testified that she did not go to the operating room right away to do a vaginal exam because the medicine she was administering for uterine atony initially stopped the bleeding. Furthermore, she believed that uterine atony was the sole cause of the bleeding and that she did not need to search for a laceration because the bleeding was in the form of clots.

¶41. According to Dr. Daigle, when the blood is in the form of clots rather than bright red bleeding, this allows an obstetrician to be certain the bleeding has one source and is uterine atony. She testified that bleeding from a vaginal laceration does not appear in the form of clots. The Taylors, on the other hand, aver that the literature offers no "clot exception" to the mandate that an obstetrician must always perform a proper exam to rule out a genital tract laceration.

¶42. After Jalena experienced a gush, Dr. Daigle admitted that she suspected something other than uterine atony was present, at which point Dr. Koren testified she should have performed a genital tract laceration because the uterus was still functioning at that point and salvageable. However, Dr. Ware testified that the laceration was not significant enough to cause the bleeding they were seeing and also because of the location of the laceration; the laceration could not be seen vaginally or through the abdomen without removing the uterus.

¶43. The jury heard evidence from both sides, including expert witness testimony, and then delivered its verdict on the last day of a week-long trial. "Only when the verdict is so

12

contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice, will this Court disturb it on appeal." ***Wal-Mart Stores, Inc. v. Johnson***, 807 So. 2d 382, 389 (Miss. 2002) (internal quotation marks omitted) (quoting ***Herrington v. Spell***, 692 So. 2d 93, 103–04 (Miss. 1997)).

¶44. The jury was instructed on the application of the standard of care to Dr. Daigle's actions. They were also instructed on the necessity for finding of proximate cause between Dr. Daigle's actions and Taylor's hysterectomy. The jury decided that Dr. Daigle did not breach the applicable standard of care and, as a result, none of her actions were the proximate cause of Taylor's hysterectomy.

¶45. The jury also considered whether Dr. Koren was to be believed rather than Dr. Shoemaker. The jury could have chosen to disregard Dr. Koren's opinions and to accept Dr. Daigle's and Dr. Shoemaker's opinion, which was their right. "The jury . . . may reject the expert's testimony just as they might any other witness." ***Hollingsworth v. Boviard Supply Co.***, 465 So. 2d 311, 314 (Miss. 1985).

¶46. Lastly, the jury was instructed that the Taylors had to prove by a preponderance of the evidence not just that there was bleeding from trauma to Taylor's genital tract, either negligently caused by Dr. Daigle or not timely recognized by Dr. Daigle, but also that, as a result of this alleged negligence, a hysterectomy was required.

¶47. Drs. Daigle, Ware, and Shoemaker all testified that the cause of Taylor's hysterectomy was arterial bleeding from the former placental site on the uterine wall due to uterine atony

and not from a genital tract laceration. So the failure to do an earlier vaginal inspection would not have a bearing on the outcome to Taylor.

¶48.	Dr. Daigle presented credible evidence that no vaginal laceration was causing Taylor's bleeding that led to her hysterectomy and, as a result, she did not believe that a vaginal exam should have been performed earlier than she did.  Therefore, we find that the trial court correctly denied the Taylors' motion for JNOV and a new trial.

### CONCLUSION

¶49.	We affirm the verdict of the jury because it was reached on factual evidence in favor of Dr. Daigle and Premier by an impartial jury.  All twelve of the jurors agreed on the verdict, and the verdict was not against the overwhelming weight of the evidence.  It should not be disturbed.

¶50.	**AFFIRMED.**

**KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.  RANDOLPH, C.J., NOT PARTICIPATING.**

14